Matthew Power
60 Humphrey Street, Apt 2
Swampscott, Massachusetts 01907
781-267-4773
*Pro Se*

| | |
|---|---|
| MATTHEW POWER <br><br> Plaintiff, <br><br> v. <br><br> CONNECTWEB TECHNOLOGIES, INC. <br> (see attached) <br><br> Defendants. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS <br><br> CIVIL ACTION NO.: <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff MATTHEW POWER by way of Complaint against Defendants alleges as follows:

<u>SUMMARY OF ACTION</u>

1.        This is an action brought under federal copyright law seeking a declaratory judgment that plaintiff Matthew Power is the exclusive author of a derivative work, or a co-author of a joint work, for which defendant Connectweb Technologies, Inc. claims to be the exclusive author. To the extent that Plaintiff is the sole author of the work, he is entitled to collect all profits obtained from the infringing uses of the work; to the extent that Plaintiff is a co-author of the work, he is entitled to continue receiving a reasonable royalty for the exploitation of the joint work.  Furthermore, Plaintiff seeks the imposition of a constructive trust or resulting trust in addition to replevin of various creative works that he authored exclusively that are maintained at the offices of Defendant Connectweb Technologies, Inc. Plaintiff also seeks damages for violations of

the Computer Fraud and Abuse Act, Digital Millennium Copyright Act, and various state or federal statutes related to this action.

## THE PARTIES

2. Plaintiff Matthew Power ("Power") is an individual residing at 60 Humphrey St, Apt. 2, Swampscott, Massachusetts 01907.

3. Defendant Michael Beaulieu ("Michael") is a citizen of the state of South Carolina who resides at 605 Hope Ferry Road, Lexington, South Carolina 29072. Michael is the Treasurer of Connectweb Technologies, Inc. During the time of the events which led up to this action, Michael was a citizen of Massachusetts who resided at 8 Mill River Lane, Rowley, Massachusetts, 01969.

4. Defendant Connectweb Technologies, Inc. ("Connectweb") is a South Carolina corporation with its principal place of business at 6143 St. Andrews Road, Columbia, South Carolina 29212. During the time of the events which led up to this action, Connectweb was a Massachusetts corporation with its principal place of business at 20 Webster Street, Floor 5, Peabody, Massachusetts 01960.

5. Defendant Paul Beaulieu ("Paul") is a citizen of the state of South Carolina who resides at 456 Amicks Ferry Road, Chapin, South Carolina 29036. Paul is the President of Connectweb Technologies, Inc. During the time of the events which led up to this action, Paul was a citizen of Massachusetts who resided in Massachusetts.

6. Defendant Rubber Stamp Champ, Inc. ("RSC") is a California corporation with its principal place of business at 409 Enterprise Street, San Marcos, California 92078.

7. Defendant Google LLC ("Google") is a Delaware corporation with its principal place of business at 1600 Amphitheater Parkway, Mountain View, CA 94043. Google LLC maintains offices in Massachusetts at 355 Main Street, Cambridge, MA 02142.

8. Defendant Anchor Rubber Stamp & Printing Co., Inc. ("Anchor") is a New Jersey corporation with its principal place of business at 339 Herbertsville Road, Brick, New Jersey 08724.

9. Defendant The J. P. Cooke Company ("JPC") is a Delaware corporation with its principal place of business at 1331 Howard Street, Omaha, Nebraska, 68102.

10. Plaintiff reserves the right to name an additional 200 defendants as their names become available upon discovery, and to include approximately 1,000,000 defendants in a copyright infringement class action concerning unauthorized derivative works created by the infringers as their names and addresses become available upon discovery. To date, defendant Connectweb Technologies, Inc. is actively preventing the discovery of the names and addresses of other defendants.

<u>JURISDICTION AND VENUE</u>

11. This is an action seeking a declaratory judgment, pursuant to <u>28 U.S.C. §2201</u>, declaring Plaintiff Power the exclusive author and owner, or alternatively a co-author and co-owner, of a copyrighted work purported by Defendant Connectweb to be its own work.

12. This Court has original subject matter jurisdiction over this matter under <u>28 U.S.C. §1338(a)</u> because it seeks declaratory judgment concerning questions of federal law arising under the U.S. Copyright Act, <u>17 U.S.C. §101</u> et seq.

13. Jurisdiction is proper in this Court pursuant to <u>28 U.S.C. § 1331</u>, because this litigation arises under federal laws including the Copyright Act, the Computer Fraud and Abuse Act, and the Digital Millennium Copyright Act.

This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367 as they are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

15. This Court has personal jurisdiction over Defendant Michael Beaulieu because he was a citizen of Massachusetts who maintained a Massachusetts residence in this district and was subject to general jurisdiction within this State during the events that gave rise to this claim.

16.   This Court has personal jurisdiction over Defendant Paul Beaulieu because he was a citizen of Massachusetts who maintained a Massachusetts residence in this district and was subject to general jurisdiction within this State during the events that gave rise to this claim.

17. This Court has personal jurisdiction over Connectweb Technologies, Inc. because of the long-arm statute in that the defendant regularly and routinely does business in Massachusetts and maintains minimum business contacts in Massachusetts. Personal jurisdiction is also warranted because Connectweb Technologies, Inc. was a Massachusetts corporation who maintained a principal place of business in Massachusetts in this district and was subject to general jurisdiction within this State during the events that gave rise to this claim.

18. This Court has personal jurisdiction over Rubber Stamp Champ, Inc. because of the long-arm statute in that the defendant regularly and routinely does business in Massachusetts and maintains minimum business contacts therein; defendant has sold products to at least 7,400 customers in Massachusetts totaling more than $345,000.00 in sales during the time of the controversy; defendant actively advertises products specifically targeting Massachusetts customers; additionally, defendant sells products that

may only be used by Massachusetts notaries, namely Massachusetts notary seals and stamps.

19. This Court has personal jurisdiction over The J. P. Cooke Company because of the long-arm statute in that the defendant regularly and routinely does business in Massachusetts and maintains minimum business contacts therein; defendant actively advertises products specifically targeting Massachusetts customers; additionally, defendant sells products that may only be used by Massachusetts notaries, namely Massachusetts notary seals and stamps.

20. This Court has personal jurisdiction over Anchor Rubber Stamp & Printing Co., Inc. because of the long-arm statute in that the defendant regularly and routinely does business in Massachusetts and maintains minimum business contacts therein. Defendant actively advertises products specifically targeting Massachusetts customers; additionally, defendant sells products that may only be used by Massachusetts notaries, namely Massachusetts notary seals and stamps.

21. This Court has personal jurisdiction over Google LLC because of the long-arm statute, in that the defendant regularly and routinely does business in Massachusetts and maintains a nexus in Massachusetts; Google LLC employs many Massachusetts citizens at its offices in Massachusetts.

22. Venue is proper under 28 U.S.C. § 1400(a) and 28 U.S.C. §§ 1391(b)(2).

<u>FACTS</u>

23. Power operates a software business organized as a sole proprietorship under his own name. Power started developing software between ages 7 and 9 years old. He has many common-law copyrights to the various software programs, created mostly between years 2005 and 2020. He is also a prolific creative genius with copyrighted works in the

form of books the first published at age 11 artwork, lyrics, music, films, software, poems and has registered copyrights for various works with the United States Copyright Office since age 15. Occasionally, he has also worked as an employee in a software developer role.

24. Power originally worked for Connect Technologies, Inc. ("Connectweb") as an employee between April 2014 until October of 2015.  In October of 2015, Connectweb ran out of funds to pay its employees, and was unable to secure a loan for payroll, so it laid off all three non-shareholder employees. Connectweb expressed the desire to hire back each employee full-time when it secured a loan or otherwise received funds to pay each employee's full-time salary. Michael, Treasurer of Connectweb, maintained contact with Power while Power collected unemployment insurance benefits. Michael called Power about two months later to tell him that he was not able to secure funding yet and that Power should seriously consider offers from other employers rather than waiting to be rehired back as both had mutually desired. Power considered that statement by Michael to be the end of the employer-employee relationship between Connectweb and Power.

25. Connectweb knew as early as 2013 that Power owned an independent software business, for which software programs were produced. Michael and Paul were explicitly aware of his existing business, having seen demonstrations of various works created solely by Power.

26. Two months prior to Power agreeing to work as an independent contractor for Connectweb, Power and Michael tacitly agreed for Power to create a new modern version of Custom Vantage Web ("CVW"), software previously owned by Connectweb, based on the ASP.NET MVC Platform.  The new version of CVW would be done entirely at

6

Power's home, using his own tools, on his own schedule, at his own expense, and would be bought by Connectweb at a later time if, and only if, the project was completed and to Connectweb's satisfaction. This project was started but never completed, since Michael would urgently call him to modify the current version of CVW instead. However, the agreement shows Michael's prior understanding of Power having the means, skill, and willingness to create software as an independent contractor without any direction or control by Connectweb.

27. Power was authorized by Connectweb to create derivative works of CVW in March of 2016.

28. Power's first derivative work of CVW was created over a three-day period. During those three days, Power controlled where the work would take place; he received a flat fee for the job, not an hourly wage; he received no training or instruction about how to complete the work or the manner in which it should be completed; there was no evaluation of the work by Connectweb; Power had an opportunity for profit or loss, and incurred a loss; Power's services were available to the market and he was free to seek other work opportunities; Power determined his own hours and schedule; Power received no employee-type benefits from Connectweb; Power received a Form 1099 from Connectweb rather than a Form W2 for the work; Power and Connectweb entered into a contract for specific jobs and no more; the relationship between Connectweb and Power was not permanent, and Connectweb expressed that further jobs would not, and could not, be on a weekly basis; and the work that Power provided was not a key aspect of Connectweb's business as Connectweb is primarily a website hosting company. Power invested in the equipment he used to complete the work; and Power accrued unreimbursed expenses.

29. The additional software code that Power added to the pre-existing version of CVW qualified for copyrightability having easily passed the low bar of being Power's original work having a "modicum of creativity" and being expressed by Power into a tangible medium. Copyright protection is granted immediately upon an author expressing an idea into a tangible medium. Since no written assignment of copyright had been signed before the work was created or at any time after the work was created, all copyright in the derivative work of CVW belonged exclusively to Power. In addition, all other works created by Power between April 2016 and at least May 2018 were derivative works based on his own derivative work. He exclusively owns the copyright to each of those works, which includes the exclusive right to create further derivative works. Because Power did not relinquish any copyrights to Connectweb, any work created by any employee of Connectweb is an unauthorized derivative work based on Power's copyrighted work and is infringing.

30. Power declared all income earned from the initial project to the Massachusetts Department of Unemployment Assistance the following Sunday, as he was required. As a result, the unemployment benefits he usually received were reduced proportionally by that amount, instead of being allowed in addition to the weekly benefits. This was the expressed opposite desire of Power, who only agreed to a small nominal fee for the work under the condition that the earnings be added to the weekly unemployment benefits to start to close the gap between what he previously earned per week and the half-benefits he received from unemployment insurance. Because Power lost money from taking the first contract from Connectweb, Power refused further work from Connectweb and refused a contract job paying $104,000 per year, or $50 per hour, from another employer, in order to collect the full amount due to him through unemployment insurance benefits.

31. Upon information and belief, during the approximately four weeks between the initial job and the next job for Connectweb, Connectweb published Power's derivative work of CVW containing his additional software to an unknown number of clients. Connectweb did not seek a commercial license or a server license from Power before it uploaded his software to hundreds of clients' websites. The mass publishing of Power's software by Connectweb for financial gain was unauthorized, unlawful, and beyond the scope of any implied license.

32. After refusing requests from Michael to work again for Connectweb for about four weeks, Michael finally agreed to pay the bare minimum royalty payments in fixed weekly increments due to him from the 50% of Connectweb's earnings from his derivative work of CVW, as a compromise until Connectweb could be solvent enough to pay him his full statutory fees due to co-authors. These weekly increments of his royalty fees would increase over time and did increase on two occasions but did not reach the level of an actual 50% share in revenue as expected.

33. Power registered the first of the derivative works of CVW with the United States Copyright Office under registration number, TXu 2-254-894, effective February 25, 2021, entitled "Custom Vantage Web" ("894 Registration").  A true copy of the certificate of 894 Registration, is attached as **Exhibit A**. Connectweb is, to date, withholding other versions of CVW that belong exclusively to Power, to prevent him from registering each version under Power's name. This will unnecessarily delay, increase expenses of Plaintiff and all Defendants, and burden the Court, because Power intends to sue for at least 38 versions of CVW and may only argue for infringement for the first of these versions due to Connectweb's actions.

34. Power, being abreast of existing copyright law, warned Michael that it was a bad business decision for Michael to continue to hire Power as an independent contractor. Michael, citing continual financial hardship and multiple requests for modifications to CVW from existing clients that he could not fulfill, persuaded Power to work as a contractor again despite Power's warnings. Power explicitly warned Michael that Power aggressively writes off expenses of software development and office supplies when his contracting work outweighs any revenue from regular employment during any year, and any misclassification of Power as an independent contractor would put in jeopardy all those expenses that he would legally write off to invest in his business and to compensate for his higher tax burden as a contractor. Misclassification would also be an instance of tax evasion by Connectweb resulting in severe penalties which would undo any benefit of misclassifying Power as a contractor, when the IRS would fine Connectweb, force him to repay Power the employer's share of taxes Power paid, and reimburse Power for expense purchases he would not have made. A misclassification by Connectweb would be grounds for a Court to compensate Power for income lost by taking the job under false pretenses instead of taking a better job at any other software company in Massachusetts. According to industry and local standards for a software developer at Power's level of expertise and work experience at that time, Power lost about $65,000 per year by taking the contract job for Connectweb under false pretenses; this loss does not include business expenses which were significant.

35. Power maintained a separate server at the place of business of Connectweb to store his own work created as an independent contractor, and installed his preferred tool called Git, to handle versioning and source-control of the software he would add. It functioned to separate any work created while as an employee from any work Power created as a contractor, to avoid any confusion. Connectweb preferred to use source

10

control software called Vault for other projects and continued to use Vault to store the changes to several other programs. Power stipulated that he would have to use one of Connectweb's development computers to complete any projects as a contractor, because he did not maintain internet access at his home, and it would be unreasonable, costly, and burdensome for him to travel to Connectweb to copy the source code, travel to his home to complete the work, and then travel back to Connectweb's office to turn in the work, especially when a question would arise that would require Michael or Paul to review lines of source code. Upon information and belief, Power did not reinstate internet access at his home until 2018.

36. Connectweb fully moved its office to South Carolina in 2018. Connectweb expressed the desire to hire Power as an employee and to relocate him to South Carolina. Since Connectweb moved to South Carolina primarily to reduce the cost of running its business, Power interpreted the move as another sign that Connectweb's financial troubles would not be overcome, and his 50% stake in the profits was at risk. Therefore, Power did not move to South Carolina and asked to be hired as a remote employee, in order to collect unemployment benefits in case Connectweb went out of business or was forced to lay off employees again. In mid-2018, Power reinstated internet access and Power then used his own computer in his home to develop software for Connectweb as a remote employee for about two years due to the Connectweb moving its business out of state; he also remotely accessed the work computer owned by Connectweb, which contained his own copyrighted material as well as other projects he solely authored and various trade secrets from the time when he was a contractor. Connectweb cut access to this computer containing his copyrighted material when Power pressed Connectweb about the share of royalties to which he was entitled after Michael continued to make bad business decisions affecting the revenue of Connectweb, and therefore Power's piece of

the revenue. Power initiated the conversation about his royalties in December, because he planned to retire the next month after he could ensure adequate compensation for another developer to replace him and enough time to train that new employee or contractor. Power pressed Michael about both the lack of a non-disclosure agreement and a work-for-hire agreement assigning copyrights to Connectweb, which could affect his stake in the software. Power asked for Connectweb to ensure the creation of such documents and to create a policy regarding them before his retirement. Connectweb agreed to create these documents and policy. Connectweb agreed to a higher salary for developers and then laid off Power three weeks later on December 21st, 2020 without first obtaining an assignment of copyright or a license from Power. Power then received the documents regarding the proposed work-for-hire agreement and a non-disclosure agreement *after* he was laid off. Power did not sign or return those documents.

37. Michael, Treasurer of Connectweb, used fraud and misrepresentation in hiring Power as an independent contractor. Michael hired Power under the pretense that both Connectweb and Power would be co-authors of CVW. Power relied upon this information and reduced his fee in exchange for copyright ownership, since he would be eventually earning money from the full royalty payments due to him, and this would support him when he retired at age 40. Under copyright law, co-authors cannot infringe on the others' right to copy, reproduce, create derivative works of, distribute, and publish the work and therefore they cannot sue the other author or a client of the other who buys or rents copies of the work by a co-author, since a client typically receives a non-exclusive license to use the work. However, each co-author is bound by law to pay the other co-author 50% of proceeds from all sales of the work, regardless of how much either author contributes, providing there is no written contract which lessens the statutory percentage for one of the authors. Power shares 50% of the revenue for any co-authored work he has co-authored to

12

this day Michael breached his promise of paying to Power 50% of the proceeds of all sales from CVW which is due to co-authors. Power relied upon Michael's false pretense of co-authorship and his reliance on this promise to eventually pay 50% of all sales estopped him from pursuing any client for copyright infringement at the time; Power was prevented from discovering any infringement during the time of developing the software as a contractor until January 2021, when Michael admitted in writing that he breached his agreement and, for the first time, denied that Power had any right to the software he produced as a contractor, creating an actual controversy for the Court to decide.

38. In January 2021, when Power reached his planned age of retirement, Power offered Connectweb a licensing arrangement beneficial to the company where Power would be paid $10 per website per month for use of his software on any client's website and that this license would continue forever as long as the software was still in use, and his heirs or assigns would inherit this fee after him; since the fee was per client's site, it would increase if Connectweb gained clients and be reduced if it lost clients. This licensing arrangement would replace the 50% share of revenue that Power deserved as a co-author. Power suggested that the extra fee be added to each client's bill per month so that Connectweb could hire a developer to replace him and continue to survive without an undue burden and with no cost to the company. Power stipulated that he would register for a copyright for CVW and use it to go after any client that violated any DMCA anti-circumvention measures Power added to CVW to prevent stealing or unauthorized use of the software.  Power initially registered the copyright as a co-authorship, naming both Connectweb and Power as co-authors. Michael refused the licensing agreement, and denied even the co-authorship at that time, but Power proceeded as he stated, hoping that Michael would investigate copyright law enough to clarify his misunderstandings and pay the license fee on behalf of his company and his existing clients. Power supplied Michael

with links to the relevant laws pertaining to copyright ownership of software and the pitfalls of hiring software developers as contractors rather than employees.

39. Upon learning of his exclusive rights in the software by an emailed letter from the United States Copyright Office on May 13, 2021 concerning the initial application, Power contacted Connectweb demanding that it stop infringing on his rights. Power also contacted Michael at least three times via email about returning to him a full copy of his work when he was an independent contractor and to supply him with the Git repository he maintained at the office, which detailed all the contracts he fulfilled as a contractor. Power emailed Michael, warning that he would sue Connectweb for conversion of CVW, a true copy of which is attached herein as **Exhibit B**, and other programs created by Power after Connectweb refused to hand over property that was in Connectweb's control but was owned by Power. After Power discovered multiple infringing uses of his copyrighted software published without his consent, and spending months of his time researching case law, contacting attorneys, and discovering evidence of infringers, Power began to send several Digital Millennium Copyright Act ("DMCA") takedown notices to the registrar of the domain names, to search engines linking to the domain names, to advertising platforms used by the infringers, and to hosting companies that provided internet access and hosting services to the infringers, beginning on November 15, 2021.

40. On November 15th, 2021 Power sent a cease and desist letter to Rubber Stamp Champ, Inc. ("RSC"), one of the infringers, via email informing it of his ownership and authorship of CVW, his registration for the software with the Copyright Office, the DMCA claims sent, a demand for them to stop their infringing use of CVW, and to pay the outstanding licensing fees of $1.4 million dollars due to Power. He stated a deadline for a response of Friday, November 19th, 2021. RSC did not respond.

41. Upon information and belief, RSC conspired with Connectweb, who hosts all the infringing websites, to ban any Internet Protocol ("IP") address used by Power. Connectweb started banning Power's IP addresses, which he had previously used to send cease-and-desist letters via email, on or about November 24, 2021, making him unable to view any infringing website and making any email sent from his IP Address to an infringer rendered undeliverable. Connectweb banned Power's IP addresses by collecting a list of IP addresses owned by the Virtual Private Network ("VPN") provider, which Connectweb knew Power used regularly. These actions demonstrate willful infringement on his copyright. These actions continue to prevent discovery of evidence for use at trial. RSC and Connectweb used the ban to continue to receive millions of dollars of unjust enrichment through use of his software without authorization. This damaged his efforts to file DMCA claims, rendering him unable to provide detailed information to the appropriate online service providers ("OSPs") to disable access to or links to the infringing material, in violation of his rights under the DMCA. This constitutes a civil violation of the Computer Fraud and Abuse Act by "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value". These measures taken by Connectweb and RSC are also violations of Power's licensing agreement for CVW, where the author/owner of the software must be able to access and administer the software at all times, regardless of whether it is hosted by Power, or by another provider. Prior to Power's creation of a derivative work of CVW, Connectweb had a similar policy, and charged a fee for recreating a user account for administration by Connectweb and its employees that was removed by any client. One of Power's DMCA anti-circumvention measures of his own derivative work of CVW was the prevention of any deletion of the administrator account used by the author(s) of CVW,

15

and the prevention of the changing of its password by any other administrator account, and the prevention of the issuance of a new password via a 'Forgot Password' function where a new password would be created and sent to the email account on file. Power's standard license for the CVW software fines any licensee who successfully bans or restricts access to the owner/author of the software a flat fee of $10,000 for the violation and a daily charge of $500 for every day that access is restricted to any user account owned by the author/owner of the software or its employees, or to any IP address used by the author/owner or its employees. This damage has produced a loss exceeding $5,000 in licensing fees, loss of productivity, loss of access to client user data for the development of further statistical software and algorithms for use in commerce, and further loss of money, because of the need to purchase additional paid VPN service that would supply additional IP addresses.

42. Power has subsequently learned that as early as March 19th, 2021, Connectweb has disabled other anti-circumvention technical measures added by Power to the software to prevent unauthorized use, copying, distribution, and publication in violation of the DMCA anti-circumvention law, and Connectweb has created at least four unauthorized derivative works of CVW and distributed and publicly displayed these works on more than 200 websites after Power expressed that no commercial use of the Power's software would be allowed without a commercial or server license. All uses of CVW after knowledge of not having obtained a license from the copyright holder and knowledge of the copyright owner's claim to the work constitutes willful copyright infringement. Accessing the private source control software using Power's credentials also constitutes a violation of the Computer Fraud and Abuse Act with damages in the millions of dollars after Power's software was held hostage after repeated attempts of

16

Power expressing ownership of the software and demanding the return of a copy of the software and all source control materials.

43. Power sent a cease-and-desist letter to JPC on December 3, 2021 via certified mail to stop infringing on his copyrights and to pay any outstanding licenses fees. The letter included a copy of Power's copyright registration for CVW and gave a deadline to comply by December 15th, 2021. JPC ignored the warning and did not respond to any means of contact that Power provided. All uses of CVW after knowledge of not having obtained a license from copyright holder and knowledge of the copyright owner's claim to the work constitutes willful copyright infringement.

44. Power sent a cease-and-desist letter to Anchor on December 7, 2021 via certified mail to stop infringing on his copyrights and to pay any outstanding license fees. The letter included a copy of Power's copyright registration for CVW and gave a deadline to comply by December 15th, 2021. Anchor ignored the warning and did not respond to any means of contact that Power provided. All uses of CVW after knowledge of not having obtained a license from copyright holder and knowledge of the copyright owner's claim to the work constitutes willful copyright infringement.

45. Power sent several DMCA takedown orders to Microsoft, and the majority of the DMCA orders were fulfilled. Microsoft determined that the Bing Ads posted by the infringers linking to the infringing websites were in violation of their advertising policies regarding unauthorized use of copyrighted material. Power did not have to publish a version of CVW for comparison, and he was not required to specify in detail about what elements on the pages were infringing.

48. Power sent several DMCA takedown orders to Google LLC regarding his copyrighted material used without permission by RSC and JPC, using its own preferred method of sending DMCA via separate forms for each of its products, namely Google AdWords, Google Search, and Google Checkout. Most of these claims were denied after Power supplied enough information identifying the copyrighted work, even giving its registration number with United States Copyright Office. Power explained that the software encompasses all pages on the offending websites not just an individual page or elements on a page, and explained that a "powered by Custom Vantage Web" logo appears at the bottom of each page of each infringing site, showing that the software is in fact running the website and creating all the elements of the website. Power specified that the work was an unpublished work. According to Google's own policy regarding DMCA, an owner who does not maintain an authorized version of the work online for Google to view, must state that it is not available online. Power complied with this policy, and Google did not comply with its own policy after receiving enough information. Google stated "if you are the copyright holder for this content, please provide us with a link to the original source of the copyrighted work that you claim has been republished without authorization." Google's policy states "please tell us if the work is not available online". The rejection reason was given after repeated attempts to explain to Google that its own policy allows for cases where the authorized copy is not available online if the copyright holder states that it is not available online. Power then responded saying that Google LLC misunderstands DMCA law and that it would be liable for damages for about 1 million separate infringing uses, since it recklessly disregarded the copyright owner's claim. Google has earned significant revenue from the infringing acts and continues to earn unjust enrichment from these acts. This constitutes about 1 million separate counts of willful copyright infringement.

47. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

48. Defendant Connectweb's claim to the sole ownership of CVW, including any derivative works written solely by Plaintiff on behalf of Connectweb during pertinent times as an independent contractor, and other intellectual property created by Plaintiff at that time, creates an actual, significant, and justiciable controversy between the parties which requires resolution by this Court.

49. Defendant Connectweb maintains that it owns CVW exclusively.

50. Plaintiff contends that the derivative work of CVW he created as an independent contractor belongs to him alone, or that he is a co-author with equal rights in the CVW software if Connectweb added new copyrightable material to the derivative work before publishing it.

51. Plaintiff seeks a judicial determination concerning the ownership of CVW, related works including derivative works, and other software created by Plaintiff at that time which are maintained solely on Connectweb's computers, and the rights pertaining to each work.  Such a determination is appropriate and necessary at this time.

**COPYRIGHT INFRINGEMENT**

52. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

To the extent Plaintiff owns CVW, Defendants, excluding Google, have infringed and continue to infringe Plaintiff's exclusive rights as owner of CVW.

54. Defendants' infringing acts were committed with knowledge and willfulness, or in reckless disregard of Plaintiff's exclusive rights granted by The Copyright Act.

55. Through the acts described in this Complaint, Defendants have made significant profits and earned benefits which they are not legally or equitably entitled to retain.

56. The Defendants have damaged Plaintiff by their acts of infringement, and if not stopped by this Court, will continue to damage Plaintiff, and cause him irreparable harm, for which Plaintiff has no adequate remedy at law.

57. Plaintiff is entitled to recover actual or statutory damages pursuant to 17 U.S.C. § 504(c).

58. Plaintiff is entitled to court costs, attorney's fees including the fees to represent himself, any expenses related to attending court proceedings including travel expenses, and costs of collection, pursuant to 17 U.S.C. § 505.

## CONSPIRACY TO COMMIT COPYRIGHT INFRINGEMENT

59. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

60. To the extent Plaintiff owns CVW, Defendants RSC and Connectweb have infringed and continue to infringe Plaintiff's exclusive rights as owner of CVW.

61. Defendants IQSC and Connectweb, with knowledge of Plaintiff's ownership of CVW, conspired to commit copyright infringement by inventing a scheme to hide infringing uses from the Plaintiff and to thwart Plaintiff's right to take down infringing content through DMCA Orders.

62. Defendants' infringing acts were committed with knowledge and willfulness, or in reckless disregard of Plaintiff's exclusive rights granted by The Copyright Act.

63. Through the acts described in this Complaint, Defendants have made significant profits and earned benefits which they are not legally or equitably entitled to retain.

64. The Defendants have damaged Plaintiff by their acts of infringement, and if not stopped by this Court, will continue to damage Plaintiff, and cause him irreparable harm, for which Plaintiff has no adequate remedy at law.

65. Plaintiff is entitled to recover actual or statutory damages pursuant to 17 U.S.C. § 504(c).

66. Plaintiff is entitled to court costs, attorney's fees including the fees to represent himself, any expenses related to attending court proceedings including travel expenses, and costs of collection, pursuant to 17 U.S.C. § 505.

**INJUNCTIVE RELIEF**

67. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

68. Plaintiff is likely to succeed on the merits of this case.

69. There is immediate danger of irreparable harm to Plaintiff if Defendant Connectweb continues is wrongful and illegal use of Plaintiff's derivative work of CVW, and its wrongful dissemination, promotion, and distribution.

70. Defendant Connect has in its possession a version of CVW, created prior to March of 2016, that does not conflict with any rights of Plaintiff and can easily be substituted for the disputed derivative work of CVW, which is the focus of this Complaint. Plaintiff does not wish to interfere with the commerce of any client of Connectweb using this prior version. Plaintiff repeatedly demanded that Connectweb and its clients revert to this version of CVW to avoid disruption of service by DMCA Orders, to reduce the licensing fees due to Plaintiff, and to reduce the damages of infringement.

71. Plaintiff desires that his version of CVW created in March of 2016 be removed from publication, public display, and distribution, as he wishes for it to remain an unpublished work.

72. No degree of monetary compensation can compensate for the breach of Plaintiff's right to control the publication and public display of his work, as the right to control the work includes the right to *not* publish or display his work in any form after its creation.

73. Plaintiff has no other adequate remedy at law.

## BREACH OF FIDUCIARY DUTY

74. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

75. Michael, Treasurer of Connectweb, and Paul, President of Connectweb, owes fiduciary duties to Connectweb and to Plaintiff to act with faith, loyalty, prudence, diligence, honesty, and care in conducting the business of Connectweb and business deals between Connectweb and Plaintiff.

76. At several times relevant to this Complaint, Michael and Paul breached the fiduciary duties owed to Connectweb and Plaintiff by not acting within the best interests of Connectweb and Plaintiff, and not acting toward Connectweb and Plaintiff with the utmost fidelity, good faith, and care.

77. As a result of Michael and Paul's breaches of their fiduciary duties, Connectweb and Plaintiff has been greatly damaged, exposed to risk, the value of their businesses and assets have been reduced, and as a result, Connectweb and Plaintiff have suffered and continue to suffer monetary damages and irreparable harm.

78. Michael and Paul must be held personally liable for any damages on behalf of Connectweb and Plaintiff.

## CONVERSION/THEFT OF TRADE SECRETS

79. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

80. Defendants Connectweb, Michael, and Paul violated M. G. L. § 30 (2) and (4) by committing the crime of conversion by knowingly or intentionally retaining or diverting property and trade secrets from Plaintiff through a deliberate and intentional scheme to deprive Plaintiff of his assets.

81. The actions of the Defendants were reckless, intentional, willful and/or done with knowledge of the wrongfulness of the acts.

82. Defendants' acts were the proximate cause of damages incurred by Plaintiff.

83. Pursuant to M. G. L. § 30 (2) and (4), Plaintiff is entitled to recover its actual damages and/or the loss of income due to the tortious withholding of the property.

84. Plaintiff is also entitled to court costs, attorney's fees including the fees to represent himself, any expenses related to attending court proceedings including travel expenses, and costs of collection.

## BREACH OF CONTRACT

85. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

86. The agreement between Plaintiff and Connectweb to work as a contractor without an assignment of copyrights to Connectweb constitutes a valid and binding contract for copyright ownership and entitles Plaintiff to at least 50% of all revenue from the sale or leasing of CVW to any client.

87. To the extent that the Court finds that Plaintiff is a co-author of CVW that he created as a contractor as defined in 17 U.S.C § 101 *et sec.*, Plaintiff is entitled to receive 50% of all revenue from the sale or leasing of CVW to any client since March of 2016 due to equitable tolling.

88. To the extent that the Court finds that Plaintiff was a misclassified employee, Plaintiff is entitled to receive reliance damages and/or expectation damages, which at the

very least would be the difference between the amount agreed upon under the condition that work was done as a contractor and the amount Plaintiff should have received from any other job as a software developer for any employer in Massachusetts between March 2016 and December 2020 according to his level of expertise and work experience in line with the principal of Quantum Meruit. Plaintiff is also entitled to the reimbursement of any extra taxes he paid as a contractor, and the reimbursement of any expenses he expended between March 2016 and December of 2018.

89. Defendants Connectweb, Michael, and Paul have breached the agreement, by not paying Plaintiff the full amount he is owed; the breaches are not otherwise excused or justified.

90. Because of Defendants' actions, Plaintiff has suffered great monetary loss and will continue to suffer damages.

91. Defendants' acts were the proximate cause of damages incurred by Plaintiff.

**VIOLATION OF M.G.L. C. 93A, §§ 2, 11 / UNFAIR TRADE PRACTICES**

92. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

93. Plaintiff and Defendant Connectweb were both engaged in commerce in line with the meaning of M.G.L. C. 93A.

94. Connectweb's acts described above were primarily focused in the Commonwealth of Massachusetts.

95. The actions by Connectweb described above violate M.G.L. c. 93A, §§ 2, 11 in that Connectweb's actions and practices constitute unfair or deceptive acts.

96. By deceiving Plaintiff into believing he was an independent contractor, which statutorily granted him either exclusive rights to the derivative works he would create, or alternatively to a statutory percentage of all sales of the joint derivative works he would create with Connectweb, and then misappropriating all content created by Plaintiff under that assumption to the exclusion of Plaintiff, Connectweb knowingly or willfully violated M.G.L. C. 93A, §§ 2, 11.

97. As a direct result of Connectweb's actions, and its unfair or deceptive acts and practices, Plaintiff has been and continues to be wronged. Plaintiff has suffered great monetary loss, and this loss was a foreseeable effect of Connectweb's actions.

98. Plaintiff is entitled to actual damages, and two or three times the actual damages, if the Court finds that the actions from Defendants were willful. Plaintiff is also entitled to attorney's fees, including the fees to represent himself, and court costs.

**VIOLATION OF DMCA ANTI-CIRCUMVENTION TECHNICAL MEASURES**

99. Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

100.     Defendants Connectweb, Michael, and Paul have altered the password of the sole administrative user account that Plaintiff uses to enforce his license to CVW. Plaintiff added several measures to avoid the changing of the password through use of CVW by other administrator accounts, and to prevent the deletion of Plaintiff's administrator account. Defendants circumvented these measures and overwrote the

26

password in the database directly for at least 297 CVW websites. This changing of the password of Plaintiff's sole administrative account and the alteration of his software to preclude Plaintiff from accessing his software in order to cut off service to non-payers constitutes a violation of the DMCA anti-circumvention law.

101.    Defendants' acts were the proximate cause of damages incurred by Plaintiff.

102.    Plaintiff is entitled to be compensated for up to $2,500 per website for each of the approximately 297 websites where Plaintiff's administrative account was altered by circumventing the technical measures that he added to explicitly not allow the changing of the administrative account's password. Plaintiff is entitled to any other relief provided by the DMCA.

## VIOLATION OF COMPUTER FRAUD AND ABUSE ACT

103.    Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

104.    Defendants Connectweb, Michael, and Paul accessed Plaintiff's source control software using Plaintiff's credentials and used this access to create multiple unauthorized derivative works of CVW, which were then licensed to clients without Plaintiff's approval. Connectweb, Michael, and Paul also altered the password of the sole administrative user account that Plaintiff uses to enforce his license to CVW. Plaintiff added several measures to avoid the changing of the password through use of CVW by other administrator accounts and prevented the deletion of the account through other accounts. Defendants bypassed these measures by directly overwriting the password in the database for at least 297 CVW websites. The unauthorized use of Plaintiff's account to

27

gain access to the source code, the changing of the password as Plaintiff's sole administrative account, the banning of Plaintiff's IP addresses, and the alteration of his software to preclude Plaintiff from accessing his software constitutes a violation of the Computer Fraud and Abuse Act in which Plaintiff has suffered a loss of millions of dollars in license fees that were not paid due to his inability to enforce his rights due to the Defendants' actions.

105.    The Defendants Connectweb, Michael, and Paul acted with willfulness in order to continue their fraud, and to continue to enjoy benefits that they were not entitled to receive.

106.    Plaintiff is entitled to recover actual or compensatory damages, injunctive or other equitable relief, the costs of this action, reasonable attorney's fees including fees for Plaintiff to represent himself, travel expenses, expenses related to attending any court proceedings, and costs of collection.

## SECONDARY COPYRIGHT INFRINGEMENT

107.    Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

108.    Google and its clients were not granted license, permission, authorization, or consent from Plaintiff to exploit the CVW software.

109.    Plaintiff timely registered CVW with the United States Copyright Office before publishing it, and registration was granted prior to sending any DMCA Orders to Google.

110.   Using the AdWords online advertising platform, search engine, and marketplace provided by Google, Google's clients illegally reproduced, distributed, and publicly displayed Plaintiff's CVW software. The preceding activity constitutes direct infringement of Plaintiff's copyrights in violation of 17 U.S.C. §§ 106 and 501, et seq.

111.   Google is contributorily liable for the infringements of its clients described herein. Through the DMCA Orders, Google had knowledge that its ad network and search engine were being used to link to infringed copyrighted works and that RSC and JPC were repeat infringers. Google disregarded the Orders, and then materially contributed to the infringement while facilitating the infringement by continuing to provide its advertising network and listings on its search engine for its clients and its clients' customers to commit repeated acts of infringement. Upon learning of the specific ads and search engine listings that linked to infringing works, Google had the means to withhold that assistance upon learning of the infringing activity by its clients but failed to take meaningful action.

112.   By turning a blind eye to its clients' repeated infringements, Google knowingly caused, and contributed to, the unlicensed reproduction, distribution, and public displaying of Plaintiff's copyrighted works in violation of Plaintiff's exclusive rights as defined in the United States Copyright Act.

113.   Each infringement of Plaintiff's copyrighted software is a separate and distinct unlawful act.  Including the unauthorized derivative works created by users of its clients' infringing websites, Google is responsible for approximately 1 million separate infringements.

114.    The preceding acts of infringement by Google have been purposeful, willful, and intentional. The Google AdWords ads listed on **Exhibit C** represent links to a work infringed by Google's clients *after* Plaintiff located and identified those clients, and the specific ads linking to the infringing websites, to Google in multiple DMCA Orders.

115.    Plaintiff has suffered substantial and irreparable harm in an amount not yet readily calculable as a direct and proximate result of Google's unjust conduct. Unless stopped by this Court, Google will cause further irreparable harm to Plaintiff.

116.    Google regularly obtains benefits, including large profits to which Google is not entitled, as a result of ignoring multiple DMCA Orders. Upon information and belief, Google regularly receives about $50,000 per month in AdWords revenue per infringer.

117.    Plaintiff is entitled to actual damages or statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each of the works infringed, or the disgorgement of any unjust enrichment pertaining to its conduct as may be warranted under 17 U.S.C. § 504(c).

118.    Plaintiff is also entitled to be compensated for his attorneys' fees, including the fees to represent himself, and all court costs pursuant to 17 U.S.C. § 505.

## VICARIOUS COPYRIGHT INFRINGEMENT

119.    Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

120.    Google and its clients do not have any license, permission, authorization, or consent from Plaintiff to exploit the CVW software.

121.    At all pertinent times, Google had the ability to supervise and control its clients use of the Google AdWords advertising platform to restrict use and take down offending ads if its clients were advertising products or services which made use of copyrighted or trademarked materials that the clients were not authorized to use.

122.    Using the AdWords online advertising platform, search engine, and marketplace provided by Google, Google's clients illegally reproduced, distributed, and publicly displayed Plaintiff's CVW software. The preceding activity constitutes direct infringement of Plaintiff's copyrights in violation of 17 U.S.C. §§ 106 and 501, et seq.

123.    Google is vicariously liable for the illegal reproduction, distribution, and public displaying of Plaintiff's CVW software in violation of Plaintiff's exclusive rights provided by United States copyright law.

124.    Each infringement of Plaintiff's copyrighted software is a separate and distinct unlawful act.  Including the unauthorized derivative works created by users of its clients' infringing websites, Google is responsible for approximately 1 million separate infringements.

125.    The preceding acts of infringement by Google have been purposeful, willful, and intentional. The Google AdWords ads listed on **Exhibit C** represent links to a work infringed by Google's clients *after* Plaintiff located and identified those clients, and the specific ads linking to the infringing websites, to Google in multiple DMCA Orders.

126.    Plaintiff has suffered substantial and irreparable harm in an amount not yet readily calculable as a direct and proximate result of Google's unjust conduct. Unless stopped by this Court, Google will cause further irreparable harm to Plaintiff.

127.    Plaintiff is entitled to actual damages or statutory damages pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each of the works infringed, or the disgorgement of any unjust enrichment pertaining to its conduct as may be warranted under 17 U.S.C. § 504(c).

128.    Plaintiff is also entitled to be compensated for his attorneys' fees, including the fees to represent himself, and all court costs pursuant to 17 U.S.C. § 505.

**UNFAIR COMPETITION**

129.    Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

130.    Connectweb and its clients do not have any license, permission, authorization, or consent to exploit derivative works of CVW, or its related works.

131.    To the extent that the Court finds that Plaintiff is the author of any derivative work of CVW, Plaintiff is the legal owner of the copyrighted works that were infringed by Connectweb and its clients. Plaintiff invested a substantial amount of time, skill, and money in developing CVW and related software tools.

132.    The appropriation and use of CVW, related products, and trade secrets was at little or no cost by Connectweb.

133.    Connectweb has misrepresented the source of the CVW product in its contracts with clients. Connectweb falsely advertises CVW and publicly misrepresents the CVW product by inserting a logo and copyright notice that does not show that it is owned by Plaintiff, but instead purports to show that it is a copyrighted work exclusively owned by Connectweb. Plaintiff has sold and/or leased the product to its clients under this

false representation and has altered the price at which Plaintiff licenses the product resulting in an unfair advantage over Plaintiff's prospective business contracts with said clients and prospective clients. Connectweb leases the CVW product for a fixed price each month and does not allow hosting of the product by any other hosting provider, while Plaintiff licenses the CVW product for 10% of the gross sales and allows CVW to be hosted by any hosting provider the client chooses. Plaintiff has lost millions of dollars of licensing fees due to this misrepresentation.

134.    Connectweb's actions are the direct and proximate cause of the loss done to Plaintiff.

135.    Plaintiff is entitled to compensatory damages for each loss contract due to the misrepresentation of origin of CVW and any unpaid licensing fees, or such other amount as may be proper.

**REPLEVIN**

136.    Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

137.    To the extent that this Court finds that Plaintiff was an independent contractor during the time of the development of CVW and other Works, all such Works are the individual property of Plaintiff and he claims authorship and the copyrights thereof.

138.    Plaintiff stored these programs on a development computer, on media drives at the office of Connectweb, and on internal networked storage locations accessible only through use of the internal Connectweb network. Defendants have locked Plaintiff

out of the offices of Connectweb, removed his access to the internal network, and have failed to provide Plaintiff with any copies of the programs that he created.

139.     Connectweb's conduct wrongfully interferes with Plaintiff's exclusive rights as author, or alternatively, the shared rights as a co-author. The actions by Connectweb have impaired his ability to market the newest version of his Work, to make backup copies of his Work, to register newer derivative works, and to prevent unauthorized use.

## IMPOSITION OF A CONSTRUCTIVE TRUST

140.     Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

141.     Plaintiff has contributed to the development of the CVW software and developed multiple derivate works of CVW while he was an independent contractor.

142.     Connectweb has denied Plaintiff's rights as co-author and is seeking to exclude him from the profits earned by Connectweb through the exploitation of his work.

143.     Connectweb will be unjustly enriched if it is permitted to assume sole ownership of the CVW software and, therefore, a constructive trust must be imposed concerning the work. A constructive trust should include a full accounting of all profits, past and future, received from the exploitation of the CVW software and any derivative works thereof, which were authored in whole, or in part, by Plaintiff.

## IMPOSITION OF A RESULTING TRUST

144.     Plaintiff incorporates by reference paragraphs 1 to 46 as if fully set forth herein.

145. Plaintiff has contributed to the development of the CVW software and developed multiple derivate works of CVW while he was an independent contractor.

146. Connectweb has denied Plaintiff's rights as co-author and is seeking to exclude him from the profits earned by Connectweb through the exploitation of his work.

147. Plaintiff did not intend to transfer or convey his ownership stake in the derivative works of CVW that he developed while working as a contractor, nor to transfer or convey any right to make additional derivative works of his derivative works of CVW during business relationship with Connectweb, or after it ended.

148. To protect Plaintiff's interests and exclusive rights, a resulting trust should be imposed on CVW, and on any derivative works thereof.

**WHEREFORE**

Plaintiff Power hereby respectfully requests the following relief against Defendants:

A. For a declaratory judgment:

i. As to the ownership of the CVW software, each derivative work of CVW, and related software or intellectual property, and all rights ancillary to the ownership of each Work;

ii. That Defendants have violated the statutory and/or common law copyrights owned by Plaintiff;

B. That Defendants, their owners, officers, directors, agents, employees, partners, representatives, and licensees, jointly and severally, are enjoined throughout the world while this case is pending before the Court, and permanently thereafter from:

i. Copying, reproducing, manufacturing, distributing, promoting, advertising, offering for sale or selling CVW or software identical or substantially similar to any of the Works owned by Plaintiff, to the exclusive of the version of CVW created prior to March of 2016 which is undisputed;

C. An award of damages to Plaintiff, including compensatory and statutory damages, actual damages, disgorgement, double or treble damages, expectation damages, reliance damages, unpaid licensing fees, costs of suit and attorney's fees, including Plaintiff's fees

D. Ordering Defendants to render a full and complete accounting to Plaintiff of Defendants' profits, gains, and revenue received from the previously mentioned infringing acts; entering judgement for Plaintiff against Defendants for the complete damages suffered by Plaintiff and for all profits or gain by Defendants which are attributable to the unauthorized acts and copyright infringements by Defendants alleged above in amounts to be determined at trial;

E. For replevin of copies of all software programs and files authored by Plaintiff;

F. For an order prohibiting the destruction of archival copies of the software utilized by Connectweb;

G. Imposition of a constructive trust on the CVW software for the benefit of Plaintiff;

H. Imposition of a resulting trust on the CVW software for the benefit of

Plaintiff;

I. Imposition of an equitable lien on the CVW software in favor of Plaintiff;

J. Exemplary and punitive damages in a reasonable amount to deter similar acts or conduct by Defendants or others;

K. Pre- and post-judgment interest at the maximum rate allowed by law; and

L. Any other relief as this Court may deem proper and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Power hereby demands a jury

trial on all issues so triable.

Respectfully submitted,

Dated: January 10, 2021

Matthew Power
60 Humphrey Street, Apt 2
Swampscott, Massachusetts 01907
matthew_power@comcast.net
781-267-4773
*Pro Se*