UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW POWER,                              )
                                            )
                    Plaintiff,              )
        v.                                  )        CIVIL ACTION
                                            )        NO. 22-10030-JGD
CONNECTWEB TECHNOLOGIES, INC., MICHAEL      )
BEAULIEU, PAUL BEAULIEU, RUBBER STAMP       )
CHAMP, INC., ANCHOR RUBBER STAMP &          )
PRINTING CO., INC., THE J.P. COOKE COMPANY  )
and GOOGLE LLC,                             )
                                            )
                    Defendants.             )

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT ANCHOR RUBBER STAMP & PRINTING CO., INC.'S
## <u>RULE 12(b)(2) MOTION TO DISMISS</u>

January 4, 2023

DEIN, U.S.M.J.

## I.   <u>INTRODUCTION</u>

Plaintiff Matthew Power ("Power"), a resident of Massachusetts, has brought this case

for copyright infringement against his former employer, Connectweb Technologies, Inc.

("Connectweb"); two of Connectweb's officers, Michael Beaulieu ("Michael") and Paul Beaulieu

("Paul"); Google LLC ("Google"); and three of Connectweb's out-of-state customers, Rubber

Stamp Champ, Inc. ("Rubber Stamp"), Anchor Rubber Stamp & Printing Co., Inc. ("Anchor") and

The J.P. Cooke Company ("J.P. Cooke").  The plaintiff alleges that he is the sole owner, or

alternatively, the co-owner, of the copyright to the updated versions of Connectweb's Custom

Vantage Web ("CVW") software because he created a derivative version of CVW while working

for Connectweb as an independent contractor, registered his work with the United States

Copyright Office, and never assigned his rights in the copyright to Connectweb or anyone else.

By his First Amended Complaint, Power is seeking a declaratory judgment regarding his

ownership rights in CVW software, including his rights with respect to any derivative works that

he created while working as an independent contractor.  He is also seeking to hold the

defendants liable for copyright infringement, as well as alleged violations of federal and state

law.

The matter is before the court on "Defendant Anchor Rubber Stamp & Printing Co.,

Inc.'s Rule 12(b)(2) Motion to Dismiss" (Docket No. 47).[1]  By its motion, Anchor contends that

Power's claims against it must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) because the

plaintiff has failed to show that its contacts with Massachusetts are sufficient to enable this

court to exercise personal jurisdiction over it under either the Massachusetts long-arm statute

or the Due Process Clause of the United States Constitution.  For all the reasons detailed below,

this court finds that Power has failed to meet his "burden of showing that personal jurisdiction

is both statutorily authorized and consistent with the constitutional requirements of due

process." Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 121 (1st Cir. 2022).  Therefore,

Anchor's motion to dismiss is ALLOWED.

---

[1] Defendants Rubber Stamp and J.P. Cooke have also filed motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  Those motions will be addressed in separate decisions issued on this date.

## II. STATEMENT OF FACTS

### Standard of Review of Record

On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2),

"[t]he burden of proving that personal jurisdiction may be exercised in the forum state lies

squarely with the plaintiff." Kuan Chen v. United States Sports Acad., Inc., 956 F.3d 45, 54 (1st

Cir. 2020). "When a district court rules on a motion to dismiss for lack of personal jurisdiction

without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its

determination." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). Under

this standard, the plaintiff must "demonstrate the existence of every fact required to satisfy

both the forum's long-arm statute and the Due Process Clause of the Constitution." Id.

(quotations and citations omitted). "To make such a showing, the plaintiff cannot rely solely on

conclusory averments but must 'adduce evidence of specific facts.'" Chen, 956 F.3d at 54

(quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)).

Thus, for Power to meet his burden of establishing personal jurisdiction over Anchor in this

forum, he must "proffer evidence which, taken at face value, suffices to show all facts essential

to personal jurisdiction." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28,

34 (1st Cir. 2016). The court will "take the facts from the pleadings and whatever supplemental

filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version

of genuinely contested facts." Id. It will "then add to the mix facts put forward by the

defendants, to the extent that they are uncontradicted." N. Laminate Sales, Inc. v. Davis, 403

F.3d 14, 24 (1st Cir. 2005) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,

290 F.3d 42, 51 (1st Cir. 2002)) (additional quotations and citation omitted).  Applying this standard to the instant case, the facts relevant to Anchor's motion to dismiss are as follows.[2]

### The Parties

Power is an individual who resides in Swampscott, Massachusetts.  (Am. Compl. ¶ 2). He operates his own software business, which is organized as a sole proprietorship under his own name.  (Id. ¶ 23).  Power alleges that he "has many common-law copyrights to the various software programs, created mostly between years 2005 and 2020."  (Id.).  He further alleges that he is "a prolific creative genius with copyrighted works in the form of books – the first published at age 11 – artwork, lyrics, music, films, software, poems[,]" and that he has registered copyrights for his works since he was 15 years old.  (Id.).

During the time period from April 2014 to October 2015, Power worked as an employee for defendant Connectweb, apparently as a software developer.  (See id. ¶¶ 23-24). Connectweb is the creator of CVW, a software program that is used to support the rubber stamp industry.  (See id. ¶¶ 26, 49, 92).  Since at least 2009, Connectweb has used CVW to host its customers' websites.  (See id. ¶¶ 49, 61).  At the time of Power's employment, Connectweb was a Massachusetts corporation with a principal place of business in Peabody, Massachusetts. (See id. ¶¶ 4, 36).  However, in 2018, Connectweb moved its office to South Carolina.  (Id. ¶ 36). It is now a South Carolina corporation with a principal place of business in Columbia, South Carolina.  (Id. ¶ 4).

---

[2] Unless otherwise indicated, the facts are derived from the plaintiff's First Amended Complaint ("Am. Compl.") (Docket No. 26), including the exhibits attached thereto ("Am. Compl., Ex. __"), and from the Declaration of Tom McTague in Support of Anchor Rubber Stamp & Printing Co., Inc.'s Rule 12(b)(2) Motion to Dismiss ("McTague Decl."), which is attached to Anchor's Rule 12(b)(2) Motion to Dismiss (Docket No. 47).

Defendant Anchor is a New Jersey corporation with a principal place of business in Brick, New Jersey.  (Id. ¶ 8; McTague Decl. ¶ 4).  It is family-owned and manufactures notary supplies, such as notary seals, stamps and books, for use in 49 states throughout the country.  (McTague Decl. ¶ 3).  Power alleges that Anchor is a client of Connectweb and relies on CVW software to power its website.  (See Am. Compl. ¶¶  41 (alleging that Connectweb "hosts all infringing websites"), 44 (alleging issuance of a cease-and-desist letter warning Anchor to stop infringing on Power's copyright for CVW), 75 (claiming copyright infringement by Anchor and others)).  He also alleges generally that Anchor "regularly and routinely does business in Massachusetts[.]" (Id. ¶ 20).  Additionally, Power claims that Anchor sells Massachusetts notary seals and stamps "that may only be used by Massachusetts notaries, namely Massachusetts notary seals and stamps." (Id.).  However, Power has presented no evidence, or alleged any facts, describing the extent of Anchor's alleged business in Massachusetts or identifying any specific instances when Anchor interacted with or sold any of its products to a Massachusetts customer.  (See id.).  The evidentiary record in this case establishes that Anchor has no business locations or employees in the Commonwealth, engages in no targeted advertising to Massachusetts, and derives no significant revenue from customers located in this state.  (McTague Decl. ¶¶ 5-7).

While it is undisputed that Anchor maintains a website that is accessible in Massachusetts, the record contains no details regarding the website, such as how long it has been in existence, what type of information it contains or the extent to which visitors to the website may interact with Anchor through the website.  (Def. Mem. at 8).[3]

---

[3] "Def. Mem." refers to Defendant Anchor Rubber Stamp & Printing Co., Inc.'s Memorandum in Support of Its Rule 12(b)(2) Motion to Dismiss (Docket No. 55).

**Power's Alleged Development of Derivative Works of CVW**

Power claims that in October 2015, Connectweb laid him off from his job at the company after it ran out of funds to pay its employees. (Am. Compl. ¶ 24). He further alleges that in or about early 2016, he and Michael "tacitly agreed" that Power would create a new, modern version of CVW. (Id. ¶ 26). According to Power, the arrangement called for him to develop the new software at his own expense, while working at home on his own schedule using his own tools. (Id.). Additionally, Power and Michael allegedly agreed that Connectweb would purchase the end product at a later time if it was completed to Connectweb's satisfaction. (Id.). Power maintains that he started the project, but never completed it due to the fact that "Michael would urgently call him to modify the current version of CVW instead." (Id.).

Subsequently, in March 2016, Power allegedly entered into a contract with Connectweb pursuant to which Connectweb authorized Power to create derivative works of CVW by adding additional code to the pre-existing version of the software.[4] (Id. ¶¶ 27-29). Power claims that he completed the first derivative work of the CVW software over the course of three days, while working as an independent contractor for Connectweb. (See id. ¶¶ 26-28). He also claims that he obtained copyright protection over his work, as well as over additional derivative works of CVW. Thus, as Power alleges in his Amended Complaint:

> [t]he additional software code that Power added to the pre-existing version of
> CVW qualified for copyrightability having easily passed the low bar of being
> Power's original work having a "modicum of creativity" and being expressed by

---

[4] "A derivative work is 'a work based upon one or more preexisting works.'" Greene v. Ablon, 794 F.3d 133, 152 (1st Cir. 2015) (quoting 17 U.S.C. § 101). "It 'consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work.'" Id. (quoting Mass. Museum of Contemp. Art Found., Inc. v. Büchel, 593 F.3d 38, 64-65 (1st Cir. 2010)).

Power into a tangible medium.  Copyright protection is granted immediately
upon an author expressing an idea into a tangible medium.  Since no written
assignment of copyright had been signed before the work was created or at any
time after the work was created, all copyright in the derivative work of CVW
belonged exclusively to Power.  In addition, all other works created by Power
between April 2016 and at least May 2018 were derivative works based on his
own derivative work.  He exclusively owns the copyright to each of those works,
which includes the exclusive right to create further derivative works.  Because
Power did not relinquish any copyrights to Connectweb, any work created by any
employee of Connectweb is an unauthorized derivative work based on Power's
copyrighted work and is infringing.

(Id. ¶ 29).

Power asserts that within four weeks after he completed the new software code,

Connectweb published Power's "derivative work of CVW containing his additional software" to

hundreds of clients' websites without first seeking a license from the plaintiff.  (Id. ¶ 31).

According to Power, "[t]he mass publishing of Power's software by Connectweb for financial

gain was unauthorized, unlawful, and beyond the scope of any implied license."  (Id.).

Allegedly, however, Michael subsequently "agreed to pay the bare minimum royalty payments

in fixed weekly increments due to [Power] from the 50% of Connectweb's earnings from his

derivative work of CVW, as a compromise until Connectweb could be solvent enough to pay

him his full statutory fees due to co-authors."  (Id. ¶ 32).  Power claims that Connectweb

increased his royalty fees over time, but never paid him his full share of the fees.  (Id.).

Sometime thereafter, Power allegedly agreed to work for Connectweb as an

independent contractor with responsibility for creating additional modifications to the CVW

software.  (Id. ¶ 34).  During that time, Power used one of Connectweb's computers to

complete his projects.  (Id. ¶ 35).  However, he maintained a separate server at Connectweb's

office to store his own work.  (Id.).  He also installed his preferred software tool, called Git, to

handle versioning and source control of the software he developed.  (Id.).  Power claims that he owned the copyrights to the projects he authored and stored on Connectweb's computer.  (See id. ¶ 36).

In 2018, Connectweb moved its business from Massachusetts to South Carolina.  (Id.).  According to Power, Connectweb expressed a desire to hire Power as an employee and relocate him to South Carolina, but Power asked to work remotely instead.  (Id.).  The parties agreed and Power became employed as a remote employee of Connectweb, working from his home in Massachusetts.  (Id.).  Power alleges that during his employment, which lasted approximately two years, he used his own computer to develop software for Connectweb.  (Id.).  He also alleges that he had remote access to a Connectweb computer on which he claims to have stored his own copyrighted material, "as well as other projects he solely authored and various trade secrets from the time when he was a contractor."  (Id.).

### Power's Dispute with Connectweb

In early December 2020, Power allegedly initiated a conversation with Michael about his royalties because he planned to retire from Connectweb the following month.  (Id.).  According to the plaintiff, Connectweb laid him off from his job three weeks later, on December 21, 2020.  (Id.).  It also cut off his access to the computer containing Power's alleged copyrighted materials and refused to pay Power 50% of the revenue from any software that he co-authored during his work as an independent contractor for Connectweb.  (See id. ¶¶ 36-37).  Prior to the layoff, Connectweb failed to obtain an assignment of copyright or a license from Power.  (Id. ¶ 36).  Moreover, in January 2021, Connectweb allegedly refused to enter into a licensing arrangement that Power proposed, which would have replaced "the 50% share of revenue that Power

[8]

deserved as a co-author" of CVW software with a payment of "$10 per website per month for use of [Power's] software on any client's website" for as long as the software remained in use. (Id. ¶ 38).

Following his layoff, Power registered the first of the derivative works of CVW with the United States Copyright Office under Registration Number TXu 2-254-894.  (Id. ¶ 33).  The Registration Certificate shows that the work was completed in 2016, lists Power as its sole author and includes Power's address in Massachusetts.  (Am. Compl., Ex. A).  The registration was effective as of February 25, 2021, and the date of the registration decision was May 21, 2021.  (Id.).  Power claims that despite his demands for the return of his property from Connectweb, the company has continued to withhold additional versions of CVW "that belong exclusively to Power, to prevent him from registering each version under Power's name."  (Am. Compl. ¶¶ 33, 39).  He also claims that Connectweb has continued to use his software without authorization, disabled anti-circumvention technology that Power added to the software to prevent unauthorized use, copying, distribution and publication of his copyrighted work, and created "at least four unauthorized derivative works of CVW and distributed and publicly displayed these works on more than 200 websites[.]" (Id. ¶¶ 41-42).  Connectweb has filed counterclaims against Power in which it alleges, among other things, that it is the exclusive owner of CVW software, that all contributions Power made to the software were made for the sole benefit of Connectweb, and that Power's 2021 copyright registration is fraudulent.  (See Docket No. 52).  By its counterclaims, Connectweb is seeking a declaratory judgment

> declaring that it is the rightful owner of the copyright in the [CVW software], that the copyright in the [CVW software] asserted by Mr. Power does not exist and is therefore invalid, that the May 21, 2021 purported copyright registration by Mr. Power of the [CVW software] is fraudulent, and that Connectweb is not

infringing, has not infringed, and is not liable for infringing any of Mr. Power's purported rights by publishing and distributing any version of the [CVW software], including versions marketed as "Custom Vantage Web."

(Id. ¶ 53).  It has also asserted claims against Power for misrepresentation, defamation and misappropriation of trade secrets.  (Id. at Counts II-VI).

**Power's Allegations Against Anchor**

After allegedly discovering "multiple infringing uses of his copyrighted software published without his consent," Power began issuing "takedown notices" to various entities pursuant to the Digital Millennium Copyright Act ("DMCA").  (Am. Compl. ¶ 39; see also id. ¶¶ 45-46).  He also sent cease and desist letters to a number of Connectweb's clients.  (See id. ¶¶ 40, 43-44).  On December 7, 2021, Power allegedly sent a cease and desist letter to Anchor in which he instructed the company to stop infringing on his copyrights in CVW software and pay him all outstanding license fees for its use of his copyrighted work.  (Id. ¶ 44).  Power included a copy of his copyright registration with the letter, and gave Anchor a deadline of December 15, 2021 to comply with his demands.  (Id.).  According to Power, however, Anchor ignored his warning and failed to respond to his letter.  (Id.).  By his Amended Complaint in this action, Power is seeking to hold Anchor liable for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 et. seq.  (Id. ¶¶ 74-80).

Power contends that he uncovered the extent of the alleged copyright infringement by Connectweb's customers by searching the customers' websites for evidence that they "had created derivative works of Power's software by adding a permanent additional independently copyrightable element to his website software, thereby creating an unauthorized derivative work."  (Id. ¶ 49).  Allegedly, he was able to make this determination because "each custom

[10]

rubber stamp that was designed by a customer of any CVW website left a permanent record of

the design when the customized stamp was ordered, and this design was publicly accessible

without need for authentication to view the design."  (Id.).  Power alleges that after

downloading images from multiple CVW powered websites, he discovered that the images

"contained personally identifiable information for hundreds of thousands of U.S. citizens, and

information pertaining to government employees," including, inter alia, "Department of

Defense identification numbers for active soldiers, top secret classifications" and "data

pertaining to United States nuclear programs," as well as bank account numbers, credit card

numbers, social security numbers and dates of birth.  (Id. ¶ 51).  Although Power has alleged no

facts describing the specific data that was available from Anchor's website, he claims that

Anchor "knew about at least one of the data breaches but failed to make timely data breach

notification to customers affected and customers likely affected by the data breaches, as

required by various state laws."  (Id. ¶ 55).  However, he has not asserted any facts showing

that any of the alleged data breaches from Anchor impacted one or more residents of

Massachusetts, or that the alleged incidents created any obligations for Anchor under

Massachusetts law.  (See id.).

Additional factual details relevant to this court's analysis are set forth below where

appropriate.

### III.  ANALYSIS

Anchor has moved to dismiss Power's First Amended Complaint against it for lack of

personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  In order to exercise personal

jurisdiction over a defendant, the court must "find sufficient contacts between the defendant

and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's

Due Process clause." Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995).  Anchor argues that

Power has failed to present sufficient facts to satisfy either requirement.  (Def. Mem. at 3-8).

This court agrees for the reasons that follow.

A.       **Personal Jurisdiction Under the Massachusetts Long-Arm Statute**

The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, "sets out a list of

specific instances in which a Massachusetts court may acquire personal jurisdiction over a

nonresident defendant." Tatro v. Manor Care, Inc., 416 Mass. 763, 767, 625 N.E.2d 549, 551

(1994).  Anchor argues, and Power does not dispute, that only two of those instances – those

listed in paragraphs (a) and (d) of the statute -- are relevant to this case.  (See Def. Mem. at 4-5;

Pl. Opp. Mem. at 1-3).[5]   Therefore, the court will focus its analysis accordingly.

The relevant portions of the long-arm statute provide as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by
an agent, as to a cause of action in law or equity arising from the person's

(a)  transacting any business in this commonwealth; [or] ...

(d) causing tortious injury in this commonwealth by an act or omission outside
this commonwealth if he regularly does or solicits business, or engages in any
other persistent course of conduct, or derives substantial revenue from goods
used or consumed or services rendered, in this commonwealth....

Mass. Gen. Laws ch. 223A, §§ 3(a) and (d).  In applying these provisions to the instant case, this

court is mindful that "the statute is to be construed broadly." Merced v. JLG Indus., Inc., 170 F.

Supp. 2d 65, 70 (D. Mass. 2001).  On the other hand, to satisfy either provision of the long-arm

---

[5] "Pl. Opp. Mem." refers to the Plaintiff's Opposition to Anchor Rubber Stamp & Printing Co., Inc.'s Rule
12(b)(2) Motion to Dismiss (Docket No. 62).

statute, "the plaintiff ... must demonstrate that the defendant has a tangible connection to the forum through commercial or other appreciable contacts with the Commonwealth." Id. at 70-71.  This court finds that Power has not made the requisite showing.

Section 3(a)

"In order for jurisdiction to exist pursuant to § 3(a), the facts must satisfy two requirements: (1) the defendant must have transacted business in Massachusetts, and (2) the plaintiff's claim must have arisen from the defendant's transaction of such business." Id. at 71 (citing Tatro, 416 Mass. at 767, 625 N.E.2d at 551).  "The 'transacting any business' clause [in § 3] has been construed broadly." Tatro, 416 Mass. at 767, 625 N.E.2d at 551 (alteration in original) (quoting Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co. KG, 26 Mass. App. Ct. 14, 17, 522 N.E.2d 989, 991 (1988)).  Nevertheless, "an isolated (and minor) transaction with a Massachusetts resident may be insufficient." Id.  Similarly, "the 'Defendant's awareness of the location of the plaintiff [in the Commonwealth] is not, on its own, enough to create personal jurisdiction over a defendant.'" BCCTC Assocs., Inc. v. Summerdale/AAHFI, L.P., 656 F. Supp. 2d 208, 215 (D. Mass. 2009) (quoting Phillips v. Prairie Eye Ctr., 530 F.3d 22, 28 (1st Cir. 2008)).  Rather, "it is the defendant's 'attempt to participate in the Commonwealth's economic life' that counts." Id. (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992)).  "[G]enerally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." Tatro, 416 Mass. at 767, 625 N.E.2d at 551-52.  This court concludes that Power has failed to make any such showing with respect to Anchor and therefore has failed to satisfy the requirements of § 3(a).

"[T]he law in Massachusetts is well-established that isolated transactions unaccompanied by 'purposeful intent' on the part of [a] defendant[ ] and having only a 'slight effect on the commerce of the Commonwealth' are not enough to support jurisdiction under subsection (a) of the long-arm statute." Sun Life Assurance Co. of Canada v. Sun Bancorp, Inc., 946 F. Supp. 2d 182, 188 (D. Mass. 2012) (quoting Intech, Inc. v. Triple "C" Marine Salvage, Inc., 444 Mass. 122, 126, 826 N.E.2d 194, 198 (2005)) (additional quotations and citation omitted). In the instant case, the record establishes that Anchor has no employees or offices in Massachusetts and derives no significant revenue from customers in this state.  (McTague Decl. ¶¶ 5, 7).  Additionally, Power has presented no evidence regarding the extent of any sales transactions between Anchor and residents of the forum.  Therefore, he has not shown that Anchor has engaged in anything more than isolated or minor transactions here.  Similarly, while Power claims that Anchor was aware of at least one breach of personal data from its website, he has not alleged any facts linking any breaches to customers of Anchor in Massachusetts. (See Am. Compl. ¶ 55).  Accordingly, he has not shown that Anchor's sales of notary products had any effect "on the commerce of the Commonwealth[.]"  Sun Life Assurance Co. of Canada, 946 F. Supp. 2d at 188 (quoting Intech, Inc., 444 Mass. at 126, 826 N.E.2d at 198) (additional quotations and citation omitted).

The record also fails to establish that Anchor carries out any advertising or marketing efforts that "specifically target Massachusetts residents," as opposed to residents of other states.  See id. (finding that defendants were not transacting business within the meaning of § 3(a) of the long-arm statute where they "[did] not specifically target Massachusetts residents as prospective banking clients.").  The evidence demonstrates that Anchor does not engage in any

[14]

targeted advertising to Massachusetts.  (McTague Decl. ¶ 6).  Moreover, Power has not alleged

any facts to show that Anchor takes specific steps to solicit business in Massachusetts or market

its products here.  Although Power alleges that Anchor "sells products that may only be used by

Massachusetts notaries, namely Massachusetts notary seals and stamps[,]" he has not

presented facts to show that Anchor's Massachusetts products are distinguishable from the

products it manufactures for notaries in the other 48 states in which it sells notary supplies.

(See Am. Compl. ¶ 20; McTague Decl. ¶ 3).  Nor has he explained how Anchor uses its website

to solicit customers in the Commonwealth.   Power's conclusory allegation that Anchor

"regularly and routinely does business in Massachusetts" is insufficient to establish that Anchor

acted with a purposeful intent to transact business in this forum.  See Vapotherm, Inc. v.

Santiago, 38 F.4th 252, 257 (1st Cir. 2022) (explaining that under the prima facie approach to

personal jurisdiction, the plaintiff "may not rely on the mere allegations of [his] complaint, but

must point to specific facts in the record that support those allegations." (quoting Jet Wine &

Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 8 (1st Cir. 2002))).  Therefore, the plaintiff has not

shown that § 3(a) of the long-arm statute provides a basis for personal jurisdiction over Anchor

in this case.

　　　　To the extent Power claims that Anchor's relationship with Connectweb constitutes

"transacting business" within the meaning of § 3(a), his claim is unpersuasive.  It is undisputed

that at some unidentified point in time, Anchor became a client of Connectweb and began

using CVW software to power its website.  (See Am.  Compl. ¶¶ 41, 44, 75).  However, the fact

that Anchor entered into an agreement with Connectweb is not enough to satisfy the

"transacting business" provision of the Massachusetts long-arm statute.  As an initial matter, it

is not clear whether Connectweb was still operating in Massachusetts and had not yet moved

to South Carolina at the time it began to provide services for Anchor.  Furthermore, even if

Connectweb was still in Massachusetts, a contractual arrangement between an out-of-state

defendant and a Massachusetts company alone is not sufficient to establish personal

jurisdiction under § 3(a).  Thus, as another court in this district has explained,

> [i]t is not true ... that any contractual communication into Massachusetts is
> sufficient to establish personal jurisdiction.  In the typical case, the focus is on
> the contacts relating to the formation of the contract; those contacts ordinarily
> must be instrumental to its formation to establish jurisdiction.  Thus, in the case
> of a typical bilateral contract and a "passive" purchaser, letters and phone calls
> into a forum that may accompany an order "are viewed as ancillary activity
> without substantial commercial consequence in the forum."  *Little, Brown and
> Co. (Inc.) v. Bourne*, 493 F. Supp. 544, 547 (D. Mass. 1980); *cf. Good Hope
> Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 10-11, 389 N.E.2d 76 (1979).

EIQnetworks, Inc. v. BHI Advanced Internet Sols., Inc., 726 F. Supp. 2d 26, 31 (D. Mass. 2010)

(footnote omitted).  Here, Power has not alleged any facts relating to the contractual

arrangement between Anchor and Connectweb.  He has not provided any allegations as to

when any such contract was formed, how it was formed, or the nature of any communications

between Anchor and Connectweb.  Moreover, he has not described Connectweb's role in

hosting its clients' websites, and what if any contact its clients have with Massachusetts.

Therefore, Power has not shown that this court may exercise personal jurisdiction over Anchor

under § 3(a) of the long-arm statute.

<u>Section 3(d)</u>

The remaining basis for personal jurisdiction under the Massachusetts long-arm statute

is equally unavailing for Power.  Section 3(d) of the statute "is applicable only if the defendant is

subject to general personal jurisdiction in Massachusetts."  Restuccia v. H&R Block Tax Servs.

[16]

LLC, No. 21-cv-10604-ADB, 2021 WL 4658734, at *5 (D. Mass. Oct. 7, 2021), and cases cited.

"General jurisdiction broadly subjects the defendant to suit in the forum state's courts 'in

respect to all matters, even those that are unrelated to the defendant's contacts with the

forum.'" Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010) (quoting Phillips Exeter

Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)).  Thus, a court may assert

general jurisdiction over an out-of-state corporation only where the defendant's "affiliations

with the State are so 'continuous and systematic' as to render [it] essentially at home in the

forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct.

2846, 2851, 180 L. Ed. 2d 796 (2011) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317,

66 S. Ct. 154, 159, 90 L. Ed. 95 (1945)).  Power has not shown, or even alleged, sufficient facts to

satisfy this standard.

The Supreme Court has "made clear that only a limited set of affiliations with a forum

will render a defendant amenable to [general] jurisdiction there." Daimler AG v. Bauman, 571

U.S. 117, 137, 134 S. Ct. 746, 760, 187 L. Ed. 2d 624 (2014).  "With respect to a corporation, the

place of incorporation and principal place of business are paradigm bases for general

jurisdiction." Id. (quotations, punctuation and citations omitted).  In addition, the Supreme

Court has left open "the possibility that in an exceptional case, a corporation's operations in a

forum other than its formal place of incorporation or principal place of business may be so

substantial and of such a nature as to render the corporation at home in that State." Id. at 139

n.19, 134 S. Ct. at 761 n.19 (internal citation omitted).  Even if this court were to accept all of

Power's unverified and unsupported allegations as true, there is no basis for a finding of

general personal jurisdiction over Anchor in this case.

It is undisputed that Anchor is a New Jersey corporation with a principal place of business in Brick, New Jersey.  (Am. Compl. ¶ 8; McTague Decl. ¶ 4).  Therefore, the defendant is considered "at home" in New Jersey for purposes of general jurisdiction.  See Chen, 956 F.3d at 57 (explaining that "[t]he paradigmatic examples of locales in which a defendant corporation is considered at home are its state of incorporation and the state that houses its principal place of business.").  On the other hand, the record contains no evidence showing that Anchor conducts substantial activities in Massachusetts.  The record establishes that the only links between Anchor and Massachusetts are its ownership of a website that is accessible in Massachusetts, its relationship with Connectweb, to the extent that entity was still located in Massachusetts at the time Anchor became its client, and an undefined number of sales to residents of the Commonwealth that did not result in significant revenue for Anchor.  (See Def. Mem. at 8; Am. Compl. ¶¶ 41, 44, 75; McTague Decl. ¶¶ 3,7).  This is far from sufficient to justify the court's assertion of general jurisdiction over the defendant.  See Chen, 956 F.3d at 57-58 (concluding that maintenance of a website and online learning platform that were accessible in Massachusetts and served Massachusetts-based students was insufficient to support a finding that defendant's contacts with Massachusetts, "whether viewed singly or in the aggregate, constitute a pattern of general business operations so unusually substantial as to render [the defendant] 'essentially at home' in the Commonwealth." (quoting BNSF Ry. Co. v. Tyrrell, 581 U.S. 402, 137 S. Ct. 1549, 1558, 198 L. Ed. 2d 36 (2017))); Cossaboon, 600 F.3d at 33-38 (finding no general jurisdiction where defendant advertised its services in the forum, operated a website accessible to residents of the forum, was registered to do business and employed one person in the forum, entered into a contract with a resident of the forum, and

provided medical treatment to forum residents).  Accordingly, Power has not shown that the long-arm statute authorizes personal jurisdiction over Anchor in this forum.

**B.**      **Personal Jurisdiction Under the Due Process Clause**

Even if Power had satisfied the requirements of the long-arm statute, he would still be required to meet his burden of establishing personal jurisdiction over Anchor under the Due Process Clause of the Fourteenth Amendment.  Anchor argues that Power's allegations are insufficient to show that this court's exercise of personal jurisdiction over it would comport with due process.  (Def. Mem. at 6-8).  This court agrees that Power has failed to meet his burden on this issue as well.

"The Due Process Clause dictates that, as a prerequisite to the exercise of personal jurisdiction, an out-of-state defendant must 'have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  Chen, 956 F.3d at 54-55 (alteration in original) (quoting Int'l Shoe Co., 326 U.S. at 316, 66 S. Ct. at 158) (additional quotations and citation omitted).  Accordingly, "[t]he accepted mode of analysis for questions involving personal jurisdiction [under the Due Process Clause] concentrates on the quality and quantity of the potential defendant's contacts with the forum."  Phillips Exeter Acad., 196 F.3d at 288.  "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State."  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty., 480 U.S. 102, 109, 107 S. Ct. 1026, 1030, 94 L. Ed. 2d 92 (1987) (punctuation and emphasis in original) (quotations and citations omitted).

[19]

For purposes of the constitutional analysis, "[p]ersonal jurisdiction may be either general or specific." Cossaboon, 600 F.3d at 31.  As this court has described above, Anchor is not subject to general jurisdiction in this forum.  Therefore, this court turns to the specific jurisdiction analysis.

As the First Circuit has explained,

> [t]he Due Process Clause imposes three requirements for exercising specific jurisdiction over out-of-forum defendants.  First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum.  See Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018).  Second, the defendant's forum-state contacts must "represent a purposeful availment of the privilege of conducting activities in that state."  Id.  Third, the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.  See id.  "Failure to make any one of these showings dooms any effort to establish specific personal jurisdiction."  Id.

Chen, 956 F.3d at 59.  "In cases involving interactions through a website that is operated from outside the forum state but that residents in that state can access, the focus of the analysis has been on the 'purposeful availment' requirement."  Media3 Techs., LLC v. CableSouth Media III, LLC, 17 F. Supp. 3d 107, 111 (D. Mass. 2014).  This is due to the fact that in such cases, "the 'purposeful availment' element often proves dispositive."  Motus, 23 F.4th at 124.  In the instant case, this court finds that Power has failed to establish that Anchor purposely availed itself of the privilege of conducting business activities in Massachusetts.  Therefore, he has not shown that this court's exercise of personal jurisdiction over that defendant would comply with due process and it is not necessary to address the relatedness or reasonableness components of the constitutional analysis.

Purposeful Availment

Purposeful availment occurs "when a defendant deliberately targets its behavior toward the society or economy of a particular forum, [such that] the forum should have the power to subject the defendant to judgment regarding that behavior." Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011). This "requirement guarantees that a defendant will not be subjected to the exercise of jurisdiction based solely on 'random, isolated or fortuitous' contacts with the forum state." Baskin-Robbins, 825 F.3d at 36 (quoting Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007)). It further "ensures that a defendant will not be swept within a state's jurisdictional reach due solely to the 'unilateral activity of another party or a third person.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)) (additional citation omitted). "[T]he two cornerstones of purposeful availment are voluntariness and foreseeability." Chen, 956 F.3d at 59 (quotations and citations omitted). "[V]oluntariness demands that the defendant's contacts with the forum result proximately from its own actions." Id. Foreseeability requires that "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being hauled into court there." Id. (quoting Burger King, 471 U.S. at 474, 105 S. Ct. at 2183) (alteration in original).

The First Circuit has considered whether an interactive website, located outside the forum state and directed at residents of every state is alone sufficient to establish purposeful availment. See Chen, 956 F.3d at 60 (considering "whether a finding of purposeful availment sufficient to warrant the exercise of specific jurisdiction can be sustained on the basis of a defendant's maintenance of a highly interactive website available in the forum and allegedly

[21]

accessed by the plaintiff there, even though no accompanying evidence shows that the website either specifically targets the forum or has resulted in the defendant's knowing receipt of substantial revenue from forum residents."); Motus, 23 F.4th at 120-21, 125-26 (considering whether plaintiff established purposeful availment based on defendant's use of website to market itself and interact with customers in Massachusetts and elsewhere in the United States).  The First Circuit has held that the availability of such a website, without more, is not enough "to render a defendant susceptible to jurisdiction in a particular forum." Motus, 23 F.4th at 125.  See also Chen, 956 F.3d at 60 (concluding that defendant "cannot be subjected to specific jurisdiction in Massachusetts based on its maintenance of an online learning platform accessible in (and allegedly accessed by [plaintiff] from) the Commonwealth.").  As the First Circuit has emphasized, "'[o]therwise, the universality of websites in the modern world would overwhelm constitutional limitations' and render website operators amenable to suit anywhere within the vast reach of the internet." Motus, 23 F.4th at 125 (quoting Chen, 956 F.3d at 60).  Accordingly, "[t]o establish specific jurisdiction, there must be more." Id.

<u>Power's Inability to Show Purposeful Availment</u>

This court finds that Power has not presented evidence of something "more" in this case.  "When assessing whether a defendant's commercial operation of a website amounts to purposeful availment, [courts] typically look to factors such as evidence of specific targeting of forum residents and evidence that the website has generated 'substantial revenue from forum residents.'" Id. (quoting Chen, 956 F.3d at 60).  Here, however, Power "has adduced no such evidence." Id.  As an initial matter, Power has not presented anything more than the unverified allegations of his complaint to support an assertion of purposeful availment with respect to

Anchor.  As this court has described above, this is inadequate to make the requisite showing.

See Barrett v. Lombardi, 239 F.3d 23, 27 (1st Cir. 2001) (explaining that even under the prima

facie standard, the plaintiff "must verify the facts alleged through materials of evidentiary

quality.").  Furthermore, although Power has alleged that Anchor sells products "that may only

be used by Massachusetts notaries, namely Massachusetts notary seals and stamps" (Am.

Compl. ¶ 20), he has failed to establish how Anchor "has sought to serve Massachusetts

residents in particular" rather than residents of nearly all fifty states.  Motus, 23 F.4th at 125.

The record demonstrates that Anchor provides notary supplies for use in 48 states in addition

to Massachusetts.  (McTague Decl. ¶ 3).  It also demonstrates that Anchor does not target its

advertising to Massachusetts and derives no significant revenue from customers in this state.

(Id. ¶¶ 6-7).  Accordingly, "the record does not support a finding that the operation of

[Anchor's] website ... constitute[s] purposeful availment with respect to Massachusetts."

Motus, 23 F.4th at 125.

In his opposition to Anchor's motion to dismiss, Power argues that Anchor maintained a

continuous relationship with Connectweb from 2010 through the end of 2017, when

Connectweb ceased operations in Massachusetts in preparation for its move to South Carolina.

(Pl. Opp. Mem. ¶ 1).  He also argues that throughout that time period, Anchor's website was

hosted on a server that was physically located in the Commonwealth.  (Id. ¶ 2).  To the extent

Power is claiming that these facts support a finding of purposeful availment, his arguments lack

merit.  As an initial matter, Power has not presented any evidence or alleged any facts

regarding the nature or extent of Anchor's arrangement with Connectweb, or substantiating its

reliance on a server that was located in Massachusetts.  Therefore, the record contains no

[23]

factual support for his assertions.  Moreover, while it is undisputed that Anchor is a client of

Connectweb and relies on the CVW software to power its website (See Am. Compl. ¶¶ 41, 44,

75; Def. Mem. at 1-2), the mere existence of a contractual relationship with an entity that is

located in the forum state is not sufficient to establish purposeful availment.  See, e.g., Copia

Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 5-6 (1st Cir. 2016) (finding no purposeful

availment in breach of contract action by Massachusetts company that provided internet

services to Jamaican resort operator where defendant accepted equipment and services from

plaintiff but there was no evidence that defendant's contacts with Massachusetts went

"beyond the insubstantial contacts that anyone would have when buying goods and services

from a company that itself happens to be in Massachusetts.");  Phillips, 530 F.3d at 28-29

(finding no purposeful availment in contract dispute based on defendant's actions in mailing a

contract to Massachusetts for plaintiff's signature and sending several follow-up

communications to plaintiff in the forum state).

　　　　Power also argues that the purposeful availment prong of the due process test is

satisfied as a result of Anchor's failure to comply with certain Massachusetts laws.  (Pl. Opp.

Mem. ¶¶ 3, 5-6).  In particular, Power argues that Anchor "has availed itself of Massachusetts

law and a Massachusetts Court can haul Anchor into this State to face fines, penalties,

imprisonment, and repayment of back taxes" due to its failure to pay sales and use tax to

Massachusetts on the software that it leased from Connectweb.  (Id. ¶ 3).  He also asserts that

Anchor "made itself liable to be hauled into Court in Massachusetts" because it "did not

properly oversee the sale of notary stamps to *only* those legally allowed to act as notary publics

in Massachusetts," in violation of Mass. Gen. Laws ch. 222, § 18.  (Id. ¶ 5 (emphasis in original)).

Additionally, Power contends that Anchor has "availed itself of jurisdiction in Massachusetts" by failing to notify its customers of past and ongoing data breaches, in violation of Mass. Gen. Laws ch. 93H and 201 Mass. Code Regs. § 17.0.  (Id. ¶ 6).

These arguments are unavailing for several reasons.  First, contacts relevant to the specific jurisdiction analysis must be related to the cause of action.  See Copia Commc'ns, 812 F.3d at 5 (explaining that contacts are not relevant to the specific jurisdiction analysis unless claims arise out of or relate to those contacts).  The asserted violations of state law are unrelated to Power's claim for copyright infringement against Anchor.  Furthermore, the purposeful availment prong of the test for specific personal jurisdiction asks whether the defendant purposefully availed itself "of the privilege of *conducting business* in the forum[.]" Motus, 23 F.4th at 124 (emphasis added).  Power's contentions that Anchor paid no sales or use taxes to Massachusetts during the time period between 2010 and the end of 2017, did not monitor the identity of individuals who may have purchased Massachusetts notary stamps to insure that they were "legally allowed to act as notary publics in Massachusetts," and did not notify customers of data breaches in accordance with Massachusetts law and regulations undermine, rather than support, any conclusion that the defendant purposefully availed itself of the privilege of conducting business in Massachusetts.  In any event, the record contains no support for Power's arguments regarding Anchor's alleged state law violations.  In particular, Power has not alleged any facts to suggest that Anchor was responsible for paying taxes to Massachusetts at any point during the time period from 2010 to 2017, or that it had even entered into a contract with Connectweb when Connectweb was operating in the Commonwealth.  Accordingly, there is no basis for his claim that Anchor violated Massachusetts

law by failing to pay sales and use taxes.  Similarly, Power has not presented any evidence

regarding the nature of specific sales that Anchor made to customers in Massachusetts or the

existence of any data breaches from the accounts of its Massachusetts customers.

Consequently, there is no basis for his assertion that the company was obligated but failed to

comply with any Massachusetts law pertaining to sales of stamps to notary publics.  Nor is

there any basis for his assertion that Anchor had an obligation to notify customers of data

breaches under Massachusetts law.  Therefore, Power's arguments are not sufficient to

withstand Anchor's challenge to personal jurisdiction, and the motion to dismiss must be

allowed.

## IV. <u>CONCLUSION</u>

For all the reasons detailed herein, this court finds that the plaintiff has failed to make a

prima facie showing that Anchor has sufficient contacts with Massachusetts to support this

court's assertion of personal jurisdiction over it.  Therefore, "Defendant Anchor Rubber Stamp

& Printing Co., Inc.'s Rule 12(b)(2) Motion to Dismiss" (Docket No. 47) is ALLOWED.


/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge