UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW POWER,                                    )
                                                  )
                    Plaintiff,                    )
      v.                                          )      CIVIL ACTION
                                                  )      NO. 22-10030-JGD
CONNECTWEB TECHNOLOGIES, INC., MICHAEL            )
BEAULIEU, and PAUL BEAULIEU,                      )
                                                  )
                    Defendants.                   )


## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

July 15, 2024

DEIN, U.S.M.J.

### I. INTRODUCTION

On January 10, 2022, Plaintiff Matthew Power ("Power") brought suit, *pro se*, against his

former employer, Connectweb Technologies, Inc. ("Connectweb"); two of Connectweb's

officers, Michael Beaulieu ("Michael") and Paul Beaulieu ("Paul") (collectively, the

"Defendants"); and others,[1] alleging, *inter alia*, to be the sole owner, or alternatively, the co-

owner, of the copyright to certain derivative versions of Connectweb's Custom Vantage Web

("CVW") software.  Through his Amended Complaint ("Am. Compl." (Docket No. 26)) and the

litany of claims asserted therein, Power seeks a declaratory judgment with respect to his

---

[1] On January 4, 2023, this court allowed defendants Anchor Rubber Stamp & Printing Co., Inc.'s and The
J.P. Cooke Company's motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P.
12(b)(2).  (See Docket Nos. 81, 82).  The court's February 13, 2023 order on the Defendants'
Consolidated Motion to Dismiss (Docket No. 93) similarly dismissed Rubber Stamp Champ, Inc. and
Google LLC from the case.  Only the claims against Connectweb, Michael, and Paul remain.

purported ownership rights in any derivative works he claims to have authored—either

exclusively or jointly—while working for Connectweb as an independent contractor.  The

remainder of Power's Amended Complaint seeks to hold the Defendants responsible under an

assortment of federal and state law theories for conduct alleged to have taken place both

during the period he worked for Connectweb and after he was terminated by the company on

December 21, 2020.

On February 13, 2023, this court issued a memorandum of decision and order dismissing

Counts II through VI, XI through XIII, and XV through XVI of the Amended Complaint but

otherwise allowed the following counts to proceed: Declaratory Judgment of Copyright

Ownership (Count I); Breach of Contract (Count VII);[2] Violation of M.G.L. ch. 93A / Unfair Trade

Practices (Count VIII); Violation of DMCA (Digital Millennium Copyright Act) (Count IX); Violation

of Computer Fraud and Abuse Act (Count X); Replevin (Count XIV); and Defamation (Count

XVII).  (See Am. Compl. ¶¶ 69-73, 107-28, 158-61, 171-81).

This matter is before the court on the "Defendants' Motion for Summary Judgment"

(Docket No. 174),[3] by which the Defendants seek entry of summary judgment in their favor on

each of Power's remaining claims and on Connectweb's counterclaim ("Countercl." (Docket No.

99)) for a declaratory judgment of copyright ownership.[4]  After consideration of the parties'

---

[2] Power's claims for Breach of Contract (Count VII) were dismissed as to Michael and Paul but otherwise allowed to proceed against Connectweb.  (See Docket No. 93).

[3] This matter is also before the court on the "Defendants' Motion [to] Strike Plaintiff's Sham Affidavit and Related Documents" (Docket No. 185).  The court has issued a separate ruling on the motion to strike, allowing it in part and denying it in part consistent with the rulings made herein.

[4] Connectweb originally filed its "Counterclaims Against Plaintiff Matthew Power" (Docket No. 52) on June 7, 2022, before realleging these same counterclaims as part of its "Answer to Plaintiff's First Amended Complaint" (Docket No. 99).  Connectweb's "Counterclaims" begin on page 18 of its answer.

written submissions and their oral arguments, and for all the reasons detailed below, the

Defendants' Motion for Summary Judgment is ALLOWED.  Power's attempt to create genuine

disputes by relying upon his own allegations and conclusory assertions is not sufficient to

survive summary judgment.

## II. <u>STATEMENT OF FACTS</u>

The facts in this case which are not in dispute are few and have otherwise been limited

by impediments and disagreements during discovery which constrained each side's ability to

introduce material into the summary judgment record.  Unless stated otherwise, the narrow set

of relevant facts which the parties do agree to are set forth below.[5]

### <u>Connectweb Hires Power as a Software Developer</u>

In May of 2014, Matthew Power, a resident of Swampscott, Massachusetts, began work

as a software developer for defendant Connectweb,[6] a technology company then based in

---

[5] The facts described herein are derived from the following materials and have been limited, where appropriate, in light of the court's ruling on the Defendants' Motion to Strike (see Docket No. 193): (1) the Defendants' "Concise Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment" ("DSOF ¶ __") (Docket No. 176) and select exhibits attached thereto ("DSOF Ex. __"); (2) the "Plaintiff's Response to Defendants' Concise Statement of Undisputed Material Facts" ("PCSOF ¶ __") (Docket No. 182); (3) the "Plaintiff's Affidavit" ("Power Aff.") (Docket No. 181-1 at CM/ECF Pages 2-53 of 94) and select exhibits attached thereto ("Power Aff. Ex. __"); (4) the "Affidavit of Michael Beaulieu in Support of Summary Judgment" ("Beaulieu Aff.") (Docket No. 191-1) and the exhibit attached thereto ("Beaulieu Aff. Ex. A"); and (5) the "Plaintiff's Affidavit" set forth in his response to the court's request for information ("Power Aff. 2") (Docket No. 192).  Unless otherwise indicated, citations to page numbers refer to the page of the cited document rather than the court's CM/ECF number across the top of the page.

[6] In his Affidavit, Power describes himself as being "an expert witness" in several fields, as he has "a particular skill in accessing the copyrightability of computer programs, including any computer source code," having "created copyrighted works in the form of artwork, [] graphics, . . . and computer programs," with "more than 15 years of professional experience with creating computer programs[,]" and has "successfully filed registrations with the United States Copyright Office."  (Power Aff. at 1-3).

Massachusetts specializing in software applications for the marking devices industry.  (DSOF ¶¶ 3, 8).

The Origin and Features of Custom Vantage Web

At some point prior to the start of Power's employment, Connectweb had begun developing software designed to provide "a specialized e-commerce system" for companies engaged in the production of rubber stamps and "other custom marking" products.  (DSOF ¶ 1). The Defendants posit that Connectweb first released this e-commerce software as early as September of 1999, although at that time the product had been known as Stamp Shop Web ("SSW") before it was eventually "rebranded" in December of 2014 to Custom Vantage Web ("CVW").  (DSOF ¶¶ 1-2, 12).  In May of 2010, Connectweb began developing a separate piece of software intended to streamline order processing and business accounting, titled Stamp Shop Manager (the "Manager Software"), which it then integrated with CVW as part of new features to the product.[7]  Connectweb maintains that both "CVW and the Manager Software were primarily created and updated" by Paul, Connectweb's president and lead software developer, and that it owned the copyright to CVW at the time Power began his employment. (DSOF ¶¶ 4, 6-7, 9).

With respect to CVW, the Defendants describe the software as one offered "on a software-as-a-service ("SaaS") basis" where subscribing clients are not granted access to CVW's source code but are instead:

> given log-in credentials that allow each client to access administrative pages on one of Connectweb's servers, where the client can customize their customer-facing websites by uploading product descriptions, product images, company

---

[7] Like SSW, the Defendants claim that Connectweb also rebranded the Manager Software to Custom Vantage Office ("CVO") during this same period.  (DSOF ¶ 12).

> logos, prices, and information about their company, as well as by categorizing
> products[,] . . . selecting website preferences and display options and
> customiz[ing] style sheets (fonts, colors, etc.).

(Beaulieu Aff. ¶¶ 4, 6; See also Beaulieu Aff. Ex. A).[8]  The Defendants make clear, however, that

the credentials and administrative features extended to clients as part of the SaaS model do not

give these clients "the ability to edit or even to see any portion of the Custom Vantage Web

source code."  (Beaulieu Aff. ¶ 6).  Furthermore, and as described by the Defendants:

> [t]here is no license agreement under which Connectweb's clients are allowed to
> make copies or derivative works of [CVW] because Connectweb's clients are not
> permitted to make copies or derivative works of its [CVW] software or to alter that
> software in any way, nor as a practical matter does the [CVW] user interface allow
> them to do so. . . . As SaaS software, [CVW] runs on Connectweb servers and all
> Connectweb client sites access the same version of [CVW].

(Id. ¶¶ 3, 5).

Power, on the other hand, describes CVW as providing "a template website to each of

[Connectweb's] new clients to adapt to their own needs" (Power Aff. ¶ 17), but claims that,

through using this template, clients can "create[] additional independently copyrightable

elements (such as a logo, written content, additional web pages, new source code)," and

thereby "create[] an authorized derivative work of CVW (a version of CVW) to the exclusion of

Connectweb[.]"  (Id. ¶ 17; see generally Power Aff. 2).  As detailed below, however, this

discrepancy does not need to be resolved in light of the applicable law.

---

[8] SaaS "generally refers to 'cloud computing' services where a provider enables a customer to use
software without the customer needing to install and maintain the software on local hardware."  Where
"[t]he customer commonly pays a subscription fee to access the software on an as-needed basis through
a website."  Marquette Univ. v. Kuali, Inc., 584 F. Supp. 3d 720, 724 (E.D. Wis. 2022) (citing In re Jobdiva,
Inc., 843 F.3d 936, 938 (Fed. Cir. 2016)) (additional citations omitted).

<u>Power's Employment Relationship with Connectweb Between May 2014 and December 2020</u>

As with the nature and copyrightability of CVW, the parties similarly dispute the nature of their employment relationship and Power's employment status during the following periods. Again, and for the reasons described below, these disputes are not material.

1.  <u>May 2014 - October 2015: Power Begins His Employment with Connectweb</u>

The Defendants contend that beginning in May 2014 and "[a]t all times during his employment[,]" Power was directed and supervised by Paul and Michael, Connectweb's CEO and sales manager.  (DSOF ¶¶ 8-9; Beaulieu Aff. ¶ 1).  They further submit that, upon being hired, Power was "paid on a W-2 basis."  (DSOF ¶ 8).  Power, however, claims that any supervision and direction occurred only during "the initial few weeks" of his employment, from May 2014 through June 2014, before he "was left unsupervised and the manner of how [he] accomplished the specific tasks was undirected."  (Power Aff. ¶ 9).

Power does admit, though, to having:

- at times received a W-2 form from Connectweb  (Power Aff. ¶ 23; PCSOF ¶¶ 16, 22);

- been "an employee of Connectweb who was tasked with fixing bugs and modifying code based on instructions from Connectweb" from January of 2015 to October of 2015  (Power Aff. ¶ 10);

- "worked on projects that [he] was assigned by Paul Beaulieu and Michael Beaulieu" between May 2014 and October 2015  (Id. ¶ 18);

- been provided with a Connectweb phone extension, phone number, email address, and "with an Internet Protocol phone . . . that [he] used between May 2014 and October 2015 when [he] was an employee."  (Id. ¶ 20)  And then again, from July 2018 to December 2020, during which "[he] was classified by Connectweb as an employee."  (Id. ¶¶ 17, 20);

- participated in intermittent meetings to discuss the company's goals and his assignments during this same period  (Id. ¶ 19);  and to having

- been directed by Connectweb to integrate new features, including style sheets and a new graphics mill, into software.  (DSOF ¶ 13; PCSOF ¶ 13).

Despite acknowledging his employment with Connectweb during this period, Power asserts that he remained an independent contractor "for each year of [his] career from 2006 until the present day," "develop[ing] software independent of Connectweb" as part of his own independent contractor software business.  (Power Aff. ¶ 11; PCSOF ¶ 11; See also Power Aff. Ex. M).

2. March 2016 - June 2018: Power Begins Works for
   Connectweb's Clients as an "Independent Contractor"

After Power was laid off by Connectweb in October of 2015 (Power Aff. ¶ 18), he claims to have resumed work with the company in March of 2016 not as its employee but instead as "an independent contractor for individual clients[,]" with Connectweb's clients hiring him in this capacity.  (Id. ¶¶ 16, 22).  Power describes having entered into an "independent contractor agreement" with Connectweb as part of this arrangement, the terms of which provided for his independent software development business to be "the exclusive outsourced company that [Connectweb] would refer clients to[.]"  (Id. ¶ 18).  According to Power, as part of his agreement with Connectweb, he would "obtain a copy of the client's website, make modifications, and deliver a single copy of the work to the client that commissioned [him] to create those features[.]"  (Id. ¶ 16).

For this reason, Power claims that he was authorized by Connectweb's clients to "create a new derivative work of each respective client's website," websites which were "wholly and exclusively owned by the respective clients[.]"  (Id. ¶ 11).  In addition to this, Power maintains that Connectweb authorized him "to create derivative works of CVW[,]" and that he received "a

written license to both SSW and CVW" when he was given administrative access to CVW by Connectweb at the start of his employment.  (Id. ¶ 46).

Power explains that in exchange for his work for clients as an independent contractor, and consistent with the terms of their alleged agreement, Connectweb "acted as a payment processor" and paid him certain "royalties" which were carved out of monthly hosting bills paid to Connectweb by its clients.  (Id. ¶¶ 24, 27).  Per the terms of this agreement, Connectweb would "relay[] [his] terms to the client" and "the client accepted the costs."  (Id. ¶ 24). However, despite these claims, Power has not submitted any evidence to support his alleged contractual relationship with Connectweb's customers.

The Defendants dispute that any such agreement relating to royalties or Power's independent contractor status ever existed, or that they ever authorized Power to create derivative works of CVW or intended to become a co-author of CVW with him.  (DSOF ¶¶ 25, 46, 48-49).  Furthermore, they dispute that Connectweb ever paid any royalties to Power.  (Id. ¶ 24).  To the contrary, the Defendants maintain that during the period in which Power claims to have worked as an independent contractor up through his termination in December of 2020, he was paid "a flat salary of $1,000 per week" which "gradually increased from $25 per hour to $26.44/hour over the course of that time period."  (Id. ¶¶ 27-28; DSOF Ex. G).

3.  July 2018 – December 2020: Power's Status Changes to "Remote Employee"

Sometime between 2017-2018, Connectweb relocated its operations to South Carolina. (DSOF ¶ 31).  Through the end of 2017 and up until July of 2018, Power claims to have continued "receiving royalties and commissioned work from the clients" as part of his work as an independent contractor before he eventually became a "remote employee" of Connectweb

in July 2018 and resumed his duties as a software developer for the company.  (DSOF ¶ 17;

Power Aff. ¶¶ 17, 31).  During this period, Power was paid by Connectweb through a payroll

service and issued a W-2 form for the years 2018, 2019, and 2020.  (DSOF ¶ 23; DSOF Ex. D).

Following the End of His Employment with Connectweb, Power Registers
a Version of "Custom Vantage Web" with the United States Copyright Office

On December 21, 2020, Connectweb terminated Power's employment.  (DSOF ¶ 33).

Power retained a copy of CVW even after his employment ended and in February of 2021 he

registered a "computer program" with the United States Copyright Office titled, "Custom

Vantage Web" as registration number "TXu 2-254-894," which he describes as "a derivative

work based on one client's website and [he] obtained authorization from the client to create[.]"

(Id. ¶ 53; see DSOF Ex. C; Power Aff. ¶¶ 14-15, 44).  On the Certificate of Registration, Power

listed himself as the "Copyright Claimant[,]" and as the sole individual under "Rights and

Permissions[,]" and included the following, additional information:

**Completion/Publication** -------------------------------------------------

              **Year of Completion:**   2016

**Author** -----------------------------------------------------------------------

                  •     **Author:**   Matthew Power
           **Author Created:**   computer program
       **Work made for hire:**   No

**. . .**

**Limitation of copyright claim** ----------------------------------------------

             **Material excluded from this claim:**   computer program
             **New material included in claim:**   computer program

(DSOF Ex. C at CM/ECF Page 35 of 260).  The Defendants dispute that Power ever wrote the

code to this program and instead assert that Connectweb owns the copyright to "various

[9]

versions of CVW, including the 2021 edition" which Power registered, and that they never authorized him to create any derivative versions of it.  (DSOF ¶¶ 14, 44, 46, 55; DSOF Ex. N).

<u>Power Brings Claims of Unauthorized Access, Replevin, and Defamation and Levels
Other Allegations of Misconduct Against the Defendants Following the End of His Employment</u>

At some point after his employment with Connectweb ended, Power claims that Paul accessed Power's "copyrighted material" and personal property through his unauthorized access to a "protected computer" which Power "controlled the right of access to[.]"  (Power Aff. ¶¶ 34-35).  Power alleges that, in one particular instance which occurred after he had "revoked" the Defendants' authorization to access this protected computer, Paul used Power's username and password to access the computer and then later by signing into Power's GitLab administrator account using a password Power had previously shared with him "in case he wanted to start using Git[Lab] . . . to manage his own" software development.  (<u>Id.</u> ¶¶ 34-36).  Within the GitLab account, Power claims that Paul accessed "all of the previous versions of CVW that specific clients commissioned [Power] to create for them[,]" in addition to other programs he developed.  (<u>Id.</u> ¶ 34).

Power does admit that he originally gave Paul access to the development computer when he asked him to delete a folder on the computer's desktop titled "Personal" which contained Power's bank account details and other personal information.  (<u>Id.</u> ¶ 35; Power Aff. Ex. R).  Still, he claims that after he "revoked access" to his account, the Defendants "continued to reap the rewards of access" to it.  (Power Aff. ¶ 35).  The Defendants dispute that Power ever owned or controlled a protected computer on which copyrighted material was stored, or that any Defendant ever accessed or exceeded its authorized access to one.  (DSOF ¶¶ 34-37, 39).

[10]

Power also claims that, in the wake of his termination, Connectweb changed the password of a certain administrator account he had used to access the SSW and CVW websites and later banned his IP address and altered his software by changing the "version number of individually commissioned CVW websites[,]" and merging those "versions . . . into a single version . . . in violation of [his] exclusive copyrights to those versions."  (Power Aff. ¶ 40). Power asserts that Connectweb "circumvented technical measures that [he] [had] used to enforce [his] license to CVW and cut off service to non-payers[.]"  (Id. ¶ 41).  Though Power admits to "have not yet discovered an installation of CVW[,]" he alleges that Connectweb sought "to interfere with [his] right to control the licensing of [his] own software . . . in violation of the DMCA anti-circumvention laws" when it attempted to "delete [his] special [administrator] account or change its password."  (Id. ¶¶ 38, 41).  Power also claims that despite no longer being employed by the company, Connectweb is still in possession of one "hundred or so versions of CVW" still located "on the computers and internal network at the Connectweb office[,]" various music albums and software licenses he purchased, his "intelligence gathering and anti-extortion tools," and certain data stored on a removable drive. (Id. ¶¶ 42-43).  The Defendants dispute that any such events occurred or that any defendant has any of Power's personal property.  (DSOF ¶¶ 40-43).

Finally, at some point following his termination, Power claims to have discovered defamatory statements which he suggests were published by Connectweb, embedded within images located on the websites of at least two of its clients—Rubber Stamp Champ and J.P. Cooke—and visible to any person who visited their sites.  (Power Aff. ¶¶ 45, 58).  According to Power, when a customer shared a custom stamp image with another, "the defamatory

[11]

statement appeared to those third parties, instead of the expected shared stamp images." (Id. ¶ 58).  According to Power, "Connectweb had published the false statements on websites that it controlled, in order to damage [his] reputation" and make it appear as though he had "retracted [his] former statements" to federal officials regarding "potential breaches to national security and the threat to the lives of active military personnel." (Id.).  At some point, Power explains that Rubber Stamp Champ became aware of the statements through complaints it received from customers and removed them.  (Id.).

The Defendants dispute that Connectweb or any other defendant ever made these statements, and they instead explain that it was Power who "published these statements to his own website while engaged in an illegal and unauthorized attempt to access proprietary files on the servers" of these two clients.  (DSOF ¶ 45).

On January 10, 2022, this suit followed.  (See Docket No. 1).  Additional factual details relevant to this court's analysis are set forth below where appropriate.

### III. ANALYSIS

#### A.  Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show, based upon the "materials in the record, including depositions, documents, . . . affidavits or declarations," "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) and (c)(1)(A).  "[A]n issue is

'genuine' if it 'may reasonably be resolved in favor of either party.'" <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008) (quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  <u>Id.</u> (quotations, citations, and alteration omitted).

"If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue."  <u>Allscripts Healthcare, LLC v. DR/Decision Res., LLC</u>, 521 F. Supp. 3d 112, 117-18 (D. Mass. 2021).  "The moving party is entitled to summary judgment when the record, viewed in the light most favorable to the nonmoving party, 'discloses no genuine issue of material fact and [thus] demonstrates that the moving party is entitled to a judgment as a matter of law.'"  <u>Paul v. Murphy</u>, 948 F.3d 42, 49 (1st Cir. 2020) (quoting <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006) (additional quotations and citation omitted) (alteration in original).  "The nonmoving party may 'defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.'"  <u>Id.</u> (quoting <u>Iverson</u>, 452 F.3d at 98).

"Although the record is construed in a light most favorable to the non-moving party, the Court need not consider 'conclusory allegations, improbable inferences, [or] unsupported speculation.'"  <u>Lima v. City of E. Providence</u>, 17 F.4th 202, 206 (1st Cir. 2021) (quoting <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141, 145 (1st Cir. 2006)) (alteration in original).  This is for good reason, as "[a] genuine issue of material fact does not spring into being simply because a litigant claims that one exists.  Neither wishful thinking . . . nor conclusory responses unsupported by evidence . . . will serve to defeat a properly focused Rule 56 motion."  <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990) (additional citations omitted).

[13]

And though a *pro se* litigant is, in general, entitled to some degree of deference, "pro se status does not insulate a party from complying with procedural and substantive law." Lam v. PNC Mortg., 130 F. Supp. 3d 429, 435 (D. Mass. 2015) (quoting Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997)).

### B.  Declaratory Judgement of Copyright Ownership (Count I)

In Count I of his Amended Complaint, Power claims that:

> the derivative work of CVW he created as an independent contractor belongs to him alone, or that he is a co-author with equal rights in the CVW software if Connectweb added new copyrightable material to the derivative work before publishing it.

(Am. Compl. ¶ 72).  As Power describes, he "was authorized by Connectweb to create derivative works of CVW in March of 2016" (id. ¶ 27), and for this reason, he seeks "a judicial determination concerning the ownership of CVW, related works including derivative works, and other software" he purports to have created, (id. ¶ 73).  Similarly, in its competing counterclaim seeking a declaratory judgment of copyright ownership, Connectweb requests, among other things, "an order declaring that it is the rightful owner of the copyright in the Web Software[.]"[9] (Countercl. ¶ 53).

In their "Memorandum in Support of Their Motion for Summary Judgment" ("Defs. Mem." (Docket No. 177)), the Defendants advance "four separate and independently sufficient reasons" why Power's request for a declaratory judgment fails and their own succeeds.  (Id. at 5-6).  The first of these—"Connectweb Did Not Authorize Plaintiff to Create Derivative Works of

---

[9] In its Counterclaims against Power, Connectweb first defines "Web Software" as referring to Stamp Shop Web.  (Countercl. ¶ 5).  Later, in ¶ 19, Connectweb seemingly expands the meaning behind this defined term to include CVW, explaining that "[i]n December of 2014, Connectweb rebranded the Web Software (formerly known as 'Stamp Shop Web') to 'Custom Vantage Web[.]'" (Id. ¶ 19).

CVW"—is discussed below.  (Id.).  Since the record establishes that Power was not authorized

to create derivative works, judgment shall enter in favor of the Defendants on Power's claim

and on Connectweb's own counterclaim for a declaratory judgment.

1.  There Is No Evidence That Connectweb Ever Authorized
    Power, or Any Client, to Create Derivative Works of CVW,
    Software to Which Power Has Admitted Connectweb Owns the Copyright

In the February 13, 2023 Memorandum of Decision and Order (Docket No. 93) allowing

Power's claim for a declaratory judgment of copyright ownership to withstand the Defendants'

Motion to Dismiss (Docket No. 50), this court observed that:

> Section 106 of the Copyright Act provides that the owner of a copyright has the
> exclusive right, among other things, "to prepare derivative works based upon the
> copyrighted work[.]"   17 U.S.C. § 106(2).   Because there is no dispute that
> Connectweb owned the copyright to the pre-existing version of CVW at the time
> Power began working for the company (see Am. Compl. ¶¶ 26, 92), Power's claim
> of any ownership rights in the software depends upon his ability to show that he
> obtained Connectweb's permission to create derivative works of the software.
> See Mulcahy v. Cheetah Learning LLC, 386 F.3d 849, 852 (8th Cir. 2004) ("because
> the owner of the original copyright has the exclusive right to prepare derivative
> works, the creator of an original derivative work is only entitled to a copyright if
> [he] had permission to use the underlying copyrighted work.").

(Docket No. 93 at 22-23).[10]  17 U.S.C. § 103 makes clear that any copyright in a derivative work

"extends only to the material contributed by the author of such work, as distinguished from the

preexisting material employed in the work, and does not imply any exclusive right in the

---

[10] To the extent Power now claims that "CVW was primarily created and updated by me" (Power Aff. ¶
4), this claim stands in stark contrast to the allegations of his Amended Complaint (see Am. Compl. ¶¶
26, 92) and is otherwise unsupported by the record evidence.  A plaintiff "is simply not permitted to
offer . . . evidence directly contradicting the allegations of his own complaint, in the face of a motion for
summary judgment."  Stefanik v. Friendly Ice Cream Corp., 183 F.R.D. 52, 53 (D. Mass. 1998).  He cannot
"kick over the chess board in the face of a checkmate" but instead remains "bound by the averments of
his pleadings and may not . . . contradict them to avoid summary judgment."  Id. at 54.  Therefore, the
Defendants' Motion to Strike this paragraph of Powers' Affidavit is allowed.

preexisting material."  17 U.S.C. § 103(b).  In other words, "[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work."  Stewart v. Abend, 495 U.S. 207, 223, 110 S. Ct. 1750, 1761, 109 L. Ed. 2d 184 (1990); see Greene v. Ablon, 794 F.3d 133, 152 (1st Cir. 2015).[11]

Of particular importance here, under the Copyright Act, "the copyright holder has the exclusive right . . . to prepare derivative works based upon it."  Mass. Museum of Contemp. Art Found., Inc., 593 F.3d at 48 (citing 17 U.S.C. § 106(2)); see Schrock v. Learning Curve Int'l, Inc., 586 F.3d 513, 522-23 (7th Cir. 2009) ("it is a copyright infringement to make or sell a derivative work without a license from the owner of the copyright on the work from which the derivative work is derived" (citation omitted)); see also 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.06 (Matthew Bender, Rev. Ed. 2024).  "A derivative work is simply an infringing work made non-infringing through the acquisition of permission to use the underlying preexisting expression."  Greene, 794 F.3d at 158 (citing TMTV, Corp. v. Mass Prods., Inc., 645 F.3d 464, 471 (1st Cir. 2011)).

Assuming, but not deciding, for the purposes of this decision that the versions of CVW Power alleges to have authored are indeed derivative works within the meaning of the Copyright Act, under these principles, any derivative versions he created without Connectweb's

---

[11] "A derivative work within the meaning of the Copyright Act 'consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work[.]'" Mass. Museum of Contemp. Art Found., Inc. v. Büchel, 593 F.3d 38, 64-65 (1st Cir. 2010) (quoting Nimmer, § 3.03[A]); see 17 U.S.C. § 101.  Courts have recognized that "[a]dditions and corrections to one version of computer code can result in the creation of separate and distinct derivative works."  Tavory v. Barber, Case No. 09-CV-80934-RYSKAMP/VITUNAC, 2010 WL 11505172, at *3 (S.D. Fla. Aug. 25, 2010) (citing Montgomery v. Noga, 168 F.3d 1282, 1291 (11th Cir. 1999)).

permission are unauthorized works to which Power has no ownership rights and holds no

copyright.  See Mulcahy v. Cheetah Learning LLC, 386 F.3d 849, 853 (8th Cir. 2004).  Throughout

their memorandum, the Defendants maintain that Connectweb never authorized or permitted

Power to create derivative works of CVW.  (Defs. Mem. at 7).  Power, in his Opposition to the

Defendants' Motion for Summary Judgment ("Pl. Opp." (Docket No. 181)), presents no evidence

to the contrary and does not otherwise attempt to set forth specific facts which might

demonstrate the existence of a genuine dispute.[12]  Instead, Power's present contention is that

---

[12] Power's single line of argument within his Opposition that the "Defendants gave Plaintiff a written and
perpetual license to create derivative works of CVW" (Pl. Opp. at 6) is seemingly contradicted by his
assertion that it was the clients—not Connectweb—he received authorization from to create the
derivative works in dispute.  (See id. at 4, 6).  Moreover, at most Power asserts that he "received a
written license to both SSW and CVW like all other administrators receive when given administrative
access by Connectweb."  (Power Aff. ¶ 46).  However, the routine administrative access and privileges
he received as Connectweb's software developer did not grant him a license to create derivative works
of the company's software.

Similarly, his assertion within the same paragraph that, "[w]ithin the administration area of the testing
website" for this software "was a written license to create derivative works of SSW[,]" is not supported
by the record.  (Id. (emphasis omitted)).  Power claims to have attached "true copies of the pages of the
derivative work license" (id.; Power Aff. Ex. F) and certain "help documentation" which "allows the
website owner to claim copyright ownership over all the content of the website" (id.; Power Aff. Exs. I,
Q), but a closer examination of these exhibits reveals that, in reality, they are simply selections of a
"Custom Vantage Web Help" guide presumably intended to aid clients who have subscribed to
Connectweb's SaaS service in configuring their own customer-facing websites.  They contain no
reference to any license agreement or authorization to create derivative works of the software, or any
other material or information which might suggest so.

Finally, though he does not make an explicit argument for its existence, to the extent that Power
suggests that the license he received was implied, and that any permission he was given to modify CVW
as part of his duties as a software developer automatically extended authorization to create derivative
works of the software, this argument, too, must fail.  There is no evidence in the record which might
suggest that Connectweb intended him, or any client, to possess such a license.  See John G. Danielson,
Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 40 (1st Cir. 2003) (a license "may be implied
from conduct which indicates the owner's intent to allow a licensee to use the work[,]" but "[t]he
burden of proving the existence of such a license is on the party claiming its protection" and such
licenses "are found only in narrow circumstances."); see also Estate of Hevia v. Portrio Corp., 602 F.3d
34, 40-41 (1st Cir. 2010) (same).

he received permission from Connectweb's customers.  As he argues:

> [t]he commissioner of each derivative work was not Connectweb; the commissioner was the client that commissioned Plaintiff to create the derivative work.  Each client that commissioned Plaintiff to create a derivative work owned its version of CVW exclusively of Connectweb, and Plaintiff received authorization from each client to create a derivative work before creating an adaptation of that website.

(Pl. Opp. at 4 (internal citations omitted)).  In support of this new claim, Power explains that "Connectweb gave authorization to each client to create derivative works of the website template software known as Custom Vantage Web[,] and the clients each created derivative works of the CVW template, turning its copy of the template into a real website" before commissioning Power thereafter "to create adaptations and modifications to those websites[.]" (Id. at 5 (internal citation omitted)).  In their reply to this "entirely new narrative[,]" the Defendants emphasize that, irrespective of his new theory, Power has failed "to point to any evidence of [any] purported authorization in his discovery responses, despite being asked specifically about it."  ("Defs. Reply" (Docket No. 184) at 2, 5 (emphasis omitted)).

Power's new claim suffers from the same defect as his original arguments, which failed because, beyond the conclusory statements of the affidavit he submits in support of his Opposition, Power has presented no evidence that Connectweb ever authorized or permitted him, or any of its clients, to create derivative works of CVW.  In the same way, he has failed to introduce any evidence that Connectweb's clients "exclusively" owned the versions of CVW for which he now claims they commissioned him to create further derivative versions.[13]  And

---

[13] To the extent Power believes that, by offering CVW as SaaS, Connectweb enabled clients "to create derivative works of the website template software" (Pl. Opp. at 5) when it allowed them to create customizable, customer-facing versions of the software template it provided, there is simply no evidence to support such an understanding.  As discussed supra, Power has offered no evidence of any

despite Power's claim that he was "hired and paid by the clients" to create derivative works, he has offered no actual evidence—contracts, agreements, communications, payments, or otherwise—which might suggest that this ever occurred.  (Pl. Opp. at 9).

Power's alleged status as an independent contractor during the period he claims to have created these derivative works does not alter this conclusion, as the viability of any claim of ownership rights over, or copyright to, any derivative version of CVW he alleges to have created necessarily depends on him establishing that he was authorized by Connectweb to create them in the first place.  Absent evidence of Connectweb ever having authorized Power, or any of its clients, to create works derivative of CVW, this court need not go further.

2.  Power's Claim of Co-Authorship in a
"Joint Derivative Work" with Connectweb Fails Without
<u>Evidence That His Contribution Was Anything More Than De Minimis</u>

Power's alternative claim—that he is a joint owner, or co-author, along with Connectweb of some derivative version of CVW—also fails.  In his Opposition, Power appears to argue that he "was hired by, and paid by, [a] client (not by Connectweb)" to design certain features of a "mobile-friendly version of the client's website" alongside two of Connectweb's graphic designers, thereby "co-author[ing] a version of a client's website with Connectweb[.]" (Pl. Opp. at 7, 9, 12).  For his contributions to the project, which Power claims were "merged . . . with the new graphics created by [Connectweb's] graphic designers[,]" Power asserts that he

---

license agreement or authorization to create derivative works under the terms of Connectweb's SaaS subscription service, and he has not pointed to any evidence of a separate contract or agreement which might otherwise support this belief.  Power's assertion that one client's "own terms and condition[s] proclaiming ownership" over its site is similarly misguided, as the site's copyright terms in fact state that "[a]ll software used on this site is the property of this site's owner *or its software suppliers*[.]"  (Power Aff. ¶ 46; Power Aff. Ex. J at CM/ECF Page 79 of 94 (emphasis added)).  The software supplier, *i.e.*, Connectweb, retained ownership of the software.

became a co-author with Connectweb "for at least one version of CVW" and "therefore such a work is a joint derivative work[.]" (Id. at 7-8).

It is possible for a work to "be both joint and derivative, with [the original author] alone owning the copyright in the underlying work . . . and co-owning the copyright in the derivative work with [the second author]." Greene, 794 F.3d at 153.  The Copyright Act defines a "joint work" as one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  "For a work to be 'joint,' the authors must have intended, 'at the time the writing is done,' that their contributions be merged into 'an integrated unit.'" Greene, 794 F.3d at 151 (quoting Childress v. Taylor, 945 F.2d 500, 505 (2d Cir. 1991)) (additional citation omitted).  And while each author's contributions need not "be quantitatively or qualitatively equal," the First Circuit has clarified that each contribution must "be more than de minimis."  Id. (quoting Nimmer, § 6.07[A][1]).

 In support of their Motion, the Defendants claim that they "never evidenced any intent to make Plaintiff a co-author of any version [of] CVW" (Defs. Mem. at 2), but Power, citing 17 U.S.C. § 101, argues that "[w]hat is required is only that the co-authors intend that 'their contributions be merged into inseparable or interdependent parts of a unitary whole'" and that "[t]he facts satisfy this intent." (Pl. Opp. at 7 (quoting 17 U.S.C. § 101)).  Though the facts in this case can, perhaps, be viewed to support the notion that both Power and Connectweb intended their contributions to merge and become part of some "mobile-friendly" derivative version of CVW, they do not support a finding that Power's own contributions were anything more than de minimis.

Power appears to describe his contribution as only enabling the mobile site's web pages to "reference[] the graphics" created by Connectweb's designers, and "display[] them within the pages[,]" to allow "the graphics to be visible" on the mobile site.  (Pl. Opp. at 7).  Such is the extent of his alleged contribution, which appears consistent with Power's job functions and the expectations that he "modify[] code" and "make tweaks and minor updates[,]" as described by the Defendants.  (DSOF ¶ 10; DSOF Ex. J at CM/ECF Page 225 of 260).  Power's marginal contribution towards supporting the site's mobile compatibility by allowing some of its pages to support new graphics designed by Connectweb appears to be of the sort that minimally enhances the functionality—and not the broader appearance, design, utility, or existing user experience—of an existing product otherwise comprised of and supported by software to which Connectweb exclusively owns the copyright.  And, perhaps more importantly, beyond his allegations and four screenshots of the mobile version (see Power Aff. Ex P), Power has not offered any communications or instructions from Connectweb or the client, lines of developed software code related to his involvement, or any other forms of evidence which might document the extent of his supposed contribution or support of him having made one in the first place.

The allegations which had before allowed Power's claim to withstand a motion to dismiss are insufficient to defeat a motion for summary judgment.  The Defendants' Motion for Summary Judgment is allowed with respect to Count I of Power's Amended Complaint and Connectweb's own counterclaim for a declaratory judgment of copyright ownership.[14]

---

[14] In light of this conclusion, the court need not consider the Defendants' alternative arguments with respect to Count I.  (See Defs. Mem. at 6).

C.  **Breach of Contract (Count VII)**

In Count VII of his Amended Complaint, Power brings a claim of breach of contract, alleging that:

> [t]he agreement between Plaintiff and Connectweb to work as a contractor without an assignment of copyrights to Connectweb constitutes a valid and binding contract for copyright ownership and entitles Plaintiff to at least 50% of all revenue from the sale or leasing of CVW to any client. . . . Defendants Connectweb, Michael, and Paul have breached the agreement, by not paying Plaintiff the full amount he is owed; the breaches are not otherwise excused or justified.

(Am. Compl. ¶¶ 108, 111).  To prevail on a breach of contract claim under Massachusetts law, a plaintiff "must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach."  Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007).  A plaintiff bears "the burden of proving the existence of a contract."  Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009).

The Defendants claim that "[b]ecause there is no evidence of the existence of the contract, there can be no breach[.]"  (Defs. Mem. at 13).  In his Affidavit in support of his Opposition, Power appears to draw support for his claim by referencing "a written copy [of] the memorialization of [a] verbal agreement" he reached with Connectweb as evidence of an existing contract.  (Power Aff. ¶ 26).  This purported agreement, which Power produced in discovery as an attachment to his sealed Answer to the Defendants' First Set of Interrogatories (Docket No. 130), is titled "Terms of Agreement – Initial Contract" and consists of twenty terms skewed to Power's benefit which set out, among other things, his expectations and duties as an independent contractor responsible for "fulfill[ing] individual contracts for clients that clients

will commission." (DSOF Ex. E at CM/ECF Pages 94-95 of 260).[15]  There is no indication that

Connectweb ever saw or accepted these "terms" prior to this litigation.  In any event, even if

this court was to assume that this document reflects an agreement, it does not contain any of

the terms which Power is seeking to enforce.

"It is axiomatic that to create an enforceable contract, there must be agreement

between the parties on the material terms of that contract, and the parties must have a

present intention to be bound by that agreement." Conway v. Licata, 104 F. Supp. 3d 104, 113

(D. Mass. 2015) (quoting Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724

N.E.2d 699, 703 (Mass. 2000)).  "Whether the terms of a purported contact are sufficiently

definite to be enforceable is a question of law for the Court." Id. at 114, 116 n.10 (finding an

alleged oral contract detailed as part of one party's interrogatory response "unenforceable due

to indefiniteness").

Even assuming, *arguendo*, that this purported agreement could amount to an

enforceable contract, Power has not offered any evidence that Connectweb in fact breached any

of its terms.  Power's breach of contract claim is premised on Connectweb having "breached the

agreement, by not paying Plaintiff the full amount he is owed[,]" which Power asserts he is

entitled to "at least 50% of all revenue from the sale or leasing of CVW to any client." (Am.

---

[15] Pursuant to the court's June 5, 2023 Phased Discovery Order, discovery was "divided into two phases[,]" with all discovery responses to Phase I requests to "be made by sealed court filing after which any party or the court may move to unseal the filing." (Docket No. 109 at 1-2).  Although these submissions remain under seal, "for the purposes of deciding the present motion[], the Court will discuss and quote from limited portions of the sealed documents, as the probative value of doing so outweighs any prejudice to the parties." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 345-46 n.1 (S.D.N.Y. 2023) (citations omitted).  Moreover, in their briefs, both parties have either quoted from or cited to each of the sealed documents referenced in this Order, and neither party has objected to the other doing so.

Compl. ¶¶ 108, 111).  But despite this assertion, not one of the purported agreement's twenty

terms references Power's right to revenue related to the use or sale of CVW, and the single term

which does reference Power's compensation states that "Power requires Connectweb to pay

$300 for the work," and nothing further.  (DSOF Ex. E at CM/ECF Page 94 of 260).[16]  Connectweb

could not have breached a contract term, and thereby a duty, that does not itself exist in the

contract.  See Cloutier v. Trs. of Millbank Place Condo. Tr., Civil Action No. 05-30093-KPN, 2005

WL 8176415, at *3 (D. Mass. Dec. 15, 2005) (summarizing, and then quoting, 14 Howard J.

Alperin & Lawrence D. Shubow, Massachusetts Practice Series § 7.81 (3d ed. 2005), for the

proposition that "breach of contract can exist only where there is 'a duty which is due under the

contract'") (additional citation omitted).

Beyond this particular agreement, it is unclear whether Power claims that some other

contract was breached by Connectweb.  In his Opposition, he explains that he:

> co-authored a version of a client's website with Connectweb and made a new
> mobile-friendly version of the pages over the course of three months . . .
> Connectweb initially followed the contract to pay a portion of the 50% share due
> to Plaintiff and defer paying the rest when it could afford to, which was explicitly
> allowed by the contract, but then broke that contract in January 2021, when it
> refused to acknowledge that Plaintiff was the statutory co-author with
> Connectweb and was due the full 50% amount of the exploitation of his work.

(Pl. Opp. at 12 (citation omitted)).  The actual terms of the purported contract referenced by

Power do not support his rendition of any such agreement, and Power has not offered any

evidence of another agreement—written or oral—which might.

---

[16] Similarly, there are no terms which reference or relate to Power receiving a license or authorization to create derivative works, and the purported agreement's fourteenth term—that Power "retain all the rights of independent contractors in his field, including any rights pertaining to the work produced"—is vague and indefinite, and it does not alter the fact that he did not obtain any rights to the work he performed.  (See DSOF Ex. E at CM/ECF Page 94 of 260).

Finally, to the extent that Power attempts to claim damages for the "exploitation of his work" on the basis that he "was the statutory co-author" of the joint derivative work he claims to have created with Connectweb as an independent contractor, such a claim lies outside the bounds of Power's breach of contract claim in Count VII, and cannot otherwise be asserted. While it is true that a co-owner "must account to other co-owners for any profits he earns from licensing or use of the copyright[,]" Greene, 794 F.3d at 154 (additional quotations and citation omitted), for all the reasons discussed above, Power has failed to introduce any evidence which might support any claim of co-authorship and, therefore, he lacks the ability to bring such a claim. See Weber v. Geffen Records, Inc., 63 F. Supp. 2d 458, 464 (S.D.N.Y. 1999) ("the duty to account for profits presupposes a relationship as co-owners of the copyright") (citation omitted).

For these reasons, the Defendants are entitled to summary judgment as to Count VII.

### D.   Violation of M.G.L. ch. 93A, §§ 2, 11 / Unfair Trade Practices (Count VIII)

Count VIII of Power's Amended Complaint asserts a claim of unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11 ("Chapter 93A").  That claim reads, in relevant part:

> [b]y deceiving Plaintiff into believing he was an independent contractor, which statutorily granted him either exclusive rights to the derivative works he would create, or alternatively to a statutory percentage of all sales of the joint derivative works he would create with Connectweb, and then misappropriating all content created by Plaintiff under that assumption to the exclusion of Plaintiff, Connectweb knowingly or willfully violated [Chapter 93A].

(Am. Comp. ¶ 118).  Chapter 93A aims to prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  Mass. Gen. Laws ch. 93A, § 2(a).  Similarly, Section 11 of the statute provides a cause of action for those "who

[25]

engage[] in the conduct of any trade or commerce" and who suffer an injury from such acts or practices.  Mass. Gen. Laws ch. 93A, § 11.  Although there is no "precise test" for determining "when conduct crosses the line to become unfair or deceptive for purposes of Chapter 93A[,]" Massachusetts courts have "laid out a number of helpful guideposts[.]"  Hanrahran v. Specialized Loan Servicing, LLC, 54 F. Supp. 3d. 149, 154 (D. Mass. 2014) (citing Kattar v. Demoulas, 433 Mass. 1, 13, 739 N.E.2d 246, 257 (Mass. 2000)).  Conduct has been found to be "'deceptive' when it has the capacity to mislead[.]"  Id. (additional quotations and citation omitted).  Similarly, conduct found to be unfair is the product of a court's consideration of various factors, some of which include "whether it is immoral, unethical, oppressive, or unscrupulous" or "whether it causes substantial injury to consumers (or competitors or other businessmen)."  Id. (citing Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009)).

The Defendants argue that even if Power worked as an independent contractor during the period relevant to the litigation, he cannot bring a Chapter 93A claim where he "d[id] not offer his services 'generally . . . for sale to the public in a business transaction.'"  (Defs. Mem. at 14 (quoting Debnam v. FedEx Home Delivery, 766 F.3d 93, 97 (1st Cir. 2014)) (additional citation omitted)).  This court agrees that Chapter 93A is generally not applicable to employment disputes.  See Allstate Ins. Co. v. Fougere, 450 F. Supp. 3d 10, 17 (D. Mass. 2020), aff'd, 79 F.4th 172 (1st Cir. 2023).  And even assuming, arguendo, that Chapter 93A would apply to Power's relationship with Connectweb, his claim still fails.  Power's Chapter 93A claim appears rooted in the premise that Connectweb in some way deceived him and/or deprived him of the benefits of the "exclusive rights to the derivative works he would create" himself or, alternatively, the

"statutory percentage of all sales of the joint derivative works" he might receive as a co-author with Connectweb.  (Am. Compl. ¶ 118).  This premise is not supported by the record.

For reasons already discussed at length, Power cannot claim the benefit of ownership, or joint ownership, rights in any derivative work he was not authorized to produce, or for which he is not a co-author.  Power has produced no evidence—communications, agreements, or otherwise—of the Defendants ever having promised him these rights or of them having assured him of their eventual existence.  As for the purported agreement Power has offered to support his alleged status as an independent contractor, as discussed <u>supra</u>, its terms are silent as to any royalty benefit or rights to derivative or joint derivative works he might receive.  Without ever having been promised these benefits or having been entitled to them in the first place, Power cannot claim to have suffered a loss when he inevitably did not receive them.  For this reason, he cannot claim any injury or loss under the statute.  <u>See</u> <u>Shaulis v. Nordstrom, Inc.</u>, 865 F.3d 1, 13 (1st Cir. 2017) ("[N]ot only have Massachusetts courts declined to find injury under Chapter 93A where the plaintiff relies entirely on her subjective belief as to the value received, but federal courts also have routinely rejected claims of injury under Chapter 93A that were not grounded in any objective measure.").

Summary judgment as to Count VIII is granted to the Defendants.

### E.   Violation of DMCA Anti-Circumvention Technical Measures (Count IX)

Count IX of the Amended Complaint asserts a claim against Connectweb, Michael, and Paul for violations of the anti-circumvention provision of the Digital Millenium Copyright Act, or "DMCA."  (Am. Compl. ¶¶ 121-24).  There, Power alleges that the Defendants:

> altered the password of the sole administrative user account that Plaintiff uses to enforce his license to CVW.  Plaintiff added several measures to avoid the changing

of the password through use of CVW by other administrator accounts, and to prevent the deletion of Plaintiff's administrator account. Defendants circumvented these measures and overwrote the password in the database directly for at least 297 CVW websites. The changing of the password of Plaintiff's sole administrative account and the alteration of his software to preclude Plaintiff from accessing his software in order to cut off service to non-payers constitutes a violation of the DMCA anti-circumvention [provision].

(Id. ¶ 122).

This provision, found at 17 U.S.C. § 1201, "bars any person from 'circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17, "Copyrights"].'" Pearl Investments, LLC v. Standard I/O, Inc., 257 F. Supp. 2d 326, 350 (D. Me. 2003) (first alteration in original) (quoting 17 U.S.C. § 1201(a)(1)(A)). As defined by the statute, "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner[.]" 17 U.S.C. § 1201(a)(3)(A). A "technological measure" is one that "'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). A violation of Section 1201(a)(1) has been "described by Congress as the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." Pearl Investments, LLC, 257 F. Supp. 2d at 350 (quoting Universal City Studios, Inc. v. Reimerdes, 111 F. Supp. 2d 294, 316 (S.D.N.Y. 2000), aff'd, 273 F.3d 429 (2d Cir. 2001)).

In their Motion, the Defendants admit to having changed this administrative password in order to prevent Power "from accessing its servers"—a "mundane and standard security precaution after terminating an employee." (Defs. Mem. at 15). They note that because "there

is no evidence to support [Power's] claim to copyright ownership of any version of CVW[,]" there can be no "'copyrighted work'" to which they improperly gained access.  (Id. at 14).  In his Opposition, Power claims that the Defendants' actions were not borne out of security concerns but were instead "taken in order to gain access to a source control repository filled with [his] exclusively owned derivative works from approximately 100 contracts[.]"  (Pl. Opp. at 13).

As an initial matter, "using a username/password combination as intended—by entering a valid username and password, albeit without authorization—does not constitute circumvention under the DMCA."  Egilman v. Keller & Heckman, LLP, 401 F. Supp. 2d 105, 113 (D.D.C. 2005).  If this were not enough—and here, it is—Section 1201 explicitly requires that circumvention occur with respect to a measure that controls access "to a work protected under [Title 17]."  17 U.S.C. § 1201(a)(1)(A).  Because, as discussed supra, Power holds no ownership rights in, or copyright protection to, any of the unauthorized derivative versions of CVW he claims to have created, it does not follow that Connectweb or either of its employees, Paul or Michael, could have violated the DMCA's anti-circumvention provision by accessing material which was not protected by Title 17 in the first place.  See Jagex Ltd. v. Impulse Software, 750 F. Supp. 2d 228, 237 (D. Mass. 2010) (plaintiff was unlikely to succeed on the merits of its "untenable" DMCA anti-circumvention claim where it "d[id] not own a valid copyright for its software program or game client").

For these reasons, the court grants summary judgment to the Defendants on Count IX.

**F.   Violation of Computer Fraud and Abuse Act (Count X)**

The Defendants next move for summary judgment on Count X of the Amended Complaint, which consists of claims against Connectweb, Michael, and Paul for violations of the

Computer Fraud and Abuse Act ("CFAA").   (Am. Compl. ¶¶ 125-28).  Specifically, Power asserts

that:

> [t]he unauthorized use of Plaintiff's account to gain access to the source code, the
> changing of the password of Plaintiff's sole administrative account, the banning of
> Plaintiff's IP addresses, and the alteration of his software to preclude Plaintiff from
> accessing his software constitutes a violation of the [CFAA].

(Id. ¶ 126).  While the CFAA creates criminal penalties for specific computer-related offenses, it

also allows a plaintiff to institute a civil action against any person who "intentionally[,]" or

"knowingly and with intent to defraud, accesses a protected computer without authorization,

or exceeds authorized access[.]"[17]  18 U.S.C. §§ 1030(a)(2) and (a)(4).  While Power has not

specified under which particular subsection of the CFAA he asserts this claim, either requires

that he must prove that the Defendants "accesse[d] a protected computer without

authorization, or exceed[ed] authorized access."[18]  Additionally, a plaintiff may only bring a civil

action "so long as the person has suffered 'damage or loss by reason of a violation' of the

CFAA."  T.H. Glennon Co., Inc. v. Monday, Civil Action No. 18-30120-WGY, 2020 WL 1270970, at

*8 (D. Mass. Mar. 17, 2020) (quoting 18 U.S.C. § 1030(g)).

The parties clash over the nature and extent of the Defendants' access and the

existence of any protected computer.  In their Motion, the Defendants argue that Power has

failed to produce any evidence that he "had a protected computer, let alone that any

---

[17] Power's allegations appear to implicate these particular provisions of the CFAA.

[18] Compare 18 U.S.C. § 1030(a)(2)(C) (providing for liability against any person who "intentionally
accesses a computer without authorization or exceeds authorized access, and thereby obtains . . .
information from any protected computer"), with 18 U.S.C. § 1030(a)(4) (providing for liability against
any person who "knowingly and with intent to defraud, accesses a protected computer without
authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud
and obtains anything of value").

Defendant accessed such a computer." (Defs. Mem. at 15). The Defendants cite to one of

Power's responses to their First Set of Requests for Admissions (Docket No. 118-1), contending

that Power has since "admit[ted] that he did not own or rent the computer" referenced in his

Amended Complaint. (Id. at 15). Power does not attempt to refute these arguments but

instead claims that the CFAA "does not require that the victim owned a protected computer

only that he controlled [the] right of access," which he claims he did. (Pl. Opp. at 14).

  The court does not need to resolve this dispute. Power has failed to point to any

evidence which might support him having suffered a "damage or loss" as defined—and more

importantly, as required—by the CFAA. In describing what constitutes "damage or loss,"

Section 1030(g) makes clear that any "civil action . . . may be brought only if the conduct

involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."

18 U.S.C. § 1030(g) (footnote omitted). See Wofse v. Horn, 523 F. Supp. 3d 122, 138 (D. Mass.

2021) (recognizing that where a violation of the CFAA "'involves 1 of the factors set forth

in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i),' a private right of action exists to

remedy the violation.") (quoting Section 1030(g)). Of these subclauses,[19] only subclause (I)

---

[19] These subclauses include:

  (I) loss to 1 or more persons during any 1-year period (and, for purposes of an
  investigation, prosecution, or other proceeding brought by the
  United States only, loss resulting from a related course of conduct affecting 1
  or more other protected computers) aggregating at least $5,000 in value;

  (II) the modification or impairment, or potential modification or impairment, of
  the medical examination, diagnosis, treatment, or care of 1 or more individuals;

  (III) physical injury to any person;

  (IV) a threat to public health or safety; [or]

appears applicable to the Defendants' conduct which Power challenges.  As he contends, the

Defendants:

> used their access to both obtain a copy of a derivative work that Plaintiff's client commissioned Plaintiff to create . . . and then used that derivative work in its entirety as the basis for other websites, which it then marketed to other clients.

(Pl. Opp. at 14).  However, Power has not provided any evidence which might support these

allegations, and it would not appear possible for him to sustain any claim of loss in connection

with the use and marketing of software to which he has no ownership rights.

Summary judgment is therefore granted to the Defendants as to Count X.

**G.  Replevin (Count XIV)**

In Count XIV of his Amended Complaint, Power asserts a claim for replevin against

Connectweb.  There, Power appears to allege that the company not only interfered with his

rights as an author or co-author, in relation to his "development of CVW and other Works," but

also with his possession of the software by locking him out of its office, removing his access to

its internal network, and failing to provide him with any copies of the programs he created.

(Am. Compl. ¶¶ 159-61).  Power claims that Connectweb's actions "have impaired his ability to

market the newest version of his Work, to make backup copies of his Work, to register newer

derivative works, and to prevent unauthorized use."  (Id. ¶ 161).

A claim of replevin seeks the return of personal property alleged to have been

unlawfully taken or detained by another.  See Mass. Gen. Laws. ch. 247, § 7.  To prevail on such

---

(V)  damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security[.]

18 U.S.C. § 1030(c)(4)(A)(i)(I)-(V).

a claim, "a plaintiff must show that (1) the goods in question were unlawfully taken from their

owner's possession or have been unlawfully detained (2) the owner has a right to possession

and (3) the value of the goods exceeds $20." Children's Hosp. Corp. v. Cakir, 183 F. Supp. 3d

242, 248 (D. Mass. 2016) (additional citation omitted). "[N]ot only must the plaintiff have the

right to possession generally, but he must have the right to immediate, exclusive and

unqualified possession of the property as against each defendant." Id. (additional quotations

and citation omitted) (alteration in original).

While, in their Motion, the Defendants argue that, "copies of software programs are not

physical goods and are not subject to a claim for replevin[,]" they nevertheless acknowledge

that, even if they were, Connectweb "could not have unlawfully taken dominion over" software

it has a right to possess. (Defs. Mem. at 16-17). This court agrees that since Power has no

ownership rights in, or copyright to, the derivative works he claims to have authored—either

exclusively or with Connectweb—he has no right to possess them. See Children's Hosp. Corp.,

183 F. Supp. 3d at 248-49 (denying plaintiff's motion for judgment on the pleadings on its

replevin claim where it "failed to establish ownership of the [subject property] in its entirety–an

essential element of the replevin claim.").[20] Therefore, judgment shall enter in favor of the

Defendants on this count as well.

---

[20] In his Amended Complaint, the personal property Power allegedly sought the return of included "Works" and "programs" related to the "development of CVW[.]" (Am. Compl. ¶¶ 159-60). In his Opposition to the Defendants' Motion for Summary Judgment, Power now claims that he "has stored purchased music, purchased software, artwork, and other physical and tangible items at the Connectweb office[,]" including "a piece of software that [he] wrote called CVWTools, . . . worth $150,000 per copy[.]" (Pl. Opp. at 15). "The proper method for raising new allegations is by a motion to amend the complaint, not in response to a motion for summary judgment." Conrad v. Caliber Home Loans, Inc., Civil Action No. 16-12524-FDS, 2017 WL 1496922, at *4 n.2 (D. Mass. Apr. 25, 2017) ("Th[is] is particularly true where, as here, plaintiff has provided no evidence to substantiate any of the claims raised in the complaint or new claims raised in opposition to the motion for summary judgment. The

## H. **Defamation (Count XVII)**

The last claim subject to the Defendants' Motion for Summary Judgment is the

Amended Complaint's final count, which consists of a claim for defamation against all three

Defendants.  (Am. Compl. ¶¶ 171-81).  Therein, Power asserts that the Defendants:

> created an image containing defamatory statements about [him] . . . published the false statements to defendant [Rubber Stamp Champ's ("RSC")] and [J. P. Cooke Company's ("JPC")] websites, which they then surreptitiously added to Power's website by redirecting images on RSC's and JPC's websites, to which Power's website had previously linked, to the image containing the defamatory statements.

(Id. ¶ 172).  According to Power, these false statements, which included:

- "Nothing on this site is true"

- "To ask me why I've lied contact me[,]"

caused harm to his reputation, "lower[ed] his standing in the intelligence community[,]"

"deter[ed] others from employing him, associating with him, or dealing with him[,]" and

"imputed to Power the commission of a federal crime involving moral turpitude, for which if

true, Power could be indicted and punished."  (Id. ¶¶ 173, 176-77, 180).

"Defamation is the publication, either orally or in writing, of a statement concerning the

plaintiff which is false and causes damage to the plaintiff."  Yohe v. Nugent, 321 F.3d 35, 39 (1st

Cir. 2003).  "To prevail on a claim of defamation, a plaintiff must establish," among other things,

"that the defendant was at fault for the publication of a false statement regarding the

plaintiff[.]"  White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66, 809 N.E.2d 1034,

---

Court will not, under the circumstances, consider those unpleaded claims.").  Even if this court were inclined to entertain these new allegations, Power has provided no evidence—such as receipts demonstrating their purchase or software code indicating their development—which might support him having ever possessed these items.

1036 (2004) (citing Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-30, 782 N.E.2d 508, 510

(2003)) (footnote omitted).  "The publication element of defamation requires that the

defendant communicate the defamatory statement to a third party."  Id. (citing Ravnikar, 438

Mass. at 629, 782 N.E.2d at 510).

The allegations which support Count XVII are particularly muddled, and the shifting

nature of Power's Opposition adds little clarity.  While his arguments are difficult to

understand, Power's claim appears rooted in the belief that the Defendants first embedded

defamatory statements in an image titled "noshow.png" contained on client's websites which

were otherwise hidden from view, but later became visible to customers and site visitors after

Connectweb changed certain server settings that enabled them to be seen.  (Pl. Opp. at 16-17).

The Defendants raise multiple arguments for the defamation claim's dismissal, one of which is

that there can be no evidence of them having published the statement to a third person where

Power has admitted that the embedded statements could only be seen through use of his own

developer tools.  (Defs. Mem. at 18).  The court finds this argument by the Defendants

persuasive and does not need to reach the alternate grounds.

The Defendants cite to an interrogatory response in which Power appears to

acknowledge that he discovered the statements by inspecting "customer images" using the

"Developer Mode" of his web browser, through from which he then learned "that any image

displayed by referencing 'theimage.aspx'"—a specific file—"through the 'Inspect Image' link"—

a specific tool—then "displayed the 'noshow.png' image" containing the purported defamatory

statements rendering them visible.  (DSOF Ex. E at CM/ECF Pages 89-90 of 260).  In the same

paragraph of his interrogatory response, Power further appears to suggest that "the content of

the images" would have only been "available to any person who set, or any automated process

that set, the 'REFERER' tag of their requests to the website they are requesting images from."

(Id. at CM/ECF Page 90 of 260).  Thus, it is clear from Power's own statements that any

publication was not readily available to a third party.

Moreover, while Power claims in his Opposition that "customers of [RSC] . . . witnessed

the statement[s]" in the "noshow.png" image, he has failed to produce any proof of this

assertion, or even evidence of the alleged publication.  (See Pl. Opp. at 16).  This lack of

evidence, coupled with the inconsistencies created by his interrogatory responses, is

insufficient to create a genuine dispute.

The Defendants are therefore entitled to summary judgment on Count XVII.

## IV. <u>CONCLUSION</u>

For all the reasons detailed herein, the "Defendants' Motion for Summary Judgment"

(Docket No. 174) is ALLOWED.  A declaratory judgment shall enter on Count I of Power's

Amended Complaint, and Count I of Connectweb's Counterclaims, declaring that Connectweb is

the sole owner of the copyright to Custom Vantage Web (CVW) and any of its versions.  Power's

remaining claims are hereby dismissed.  The court will schedule a conference to discuss the

status of Connectweb's remaining counterclaims (Countercl. ¶¶ 54-106) against Power.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge
